T.C. Memo. 2000-184

UNITED STATES TAX COURT

DANIEL L. AND INGRID N. CARROLL, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 19403-89.               Filed June 23, 2000.

<u>David G. Ebert</u>, for petitioners.

<u>Lori J. Balboni</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

DAWSON, <u>Judge</u>:  This case was assigned to Special Trial Judge Robert N. Armen, Jr., pursuant to the provisions of section 7443A(b)(5) of the Internal Revenue Code in effect at the time of assignment and Rules 180, 181, and 183.[1]  The Court agrees with

---

[1] Unless otherwise indicated, all subsequent section

(continued...)

and adopts the opinion of the Special Trial Judge, which is set forth below.

OPINION OF THE SPECIAL TRIAL JUDGE

ARMEN, Special Trial Judge:  Respondent determined a deficiency with respect to petitioners' Federal income tax for 1981 in the amount of $26,639, as well as additions to tax under section 6659 in the amount of $7,992, under section 6653(a)(1) in the amount of $1,344, and under section 6653(a)(2) in the amount of 50 percent of the portion of the underpayment that is attributable to negligence.  Respondent also determined that petitioners are liable for additional interest under section 6621(c) for interest on the entire underpayment to be computed at 120 percent of the rate otherwise applicable under section 6621(a).

The issues for decision are as follows:

(1) Whether petitioners are entitled to a partnership loss and investment and energy credits flowing from the Sentinel EPE recycler leasing program entered into by Clearwater Group.  We hold that they are not.

---

(...continued)
references are to the Internal Revenue Code in effect for the taxable year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

(2) Whether petitioners are liable for additions to tax under section 6653(a)(1) and (2) for negligence or intentional disregard of rules or regulations. We hold that they are.

(3) Whether petitioners are liable for the addition to tax under section 6659 for an underpayment of tax attributable to a valuation overstatement. We hold that they are.

(4) Whether petitioners are liable for additional interest under section 6621(c). We hold that they are.

FINDINGS OF FACT

Some of the facts have been stipulated, and they are so found. The stipulated facts and attached exhibits are incorporated herein by this reference. Petitioners resided in Garden City, New York, at the time that their petition was filed with the Court.

A. The Recycling Transactions

This case is a part of the Plastics Recycling group of cases. In particular, the deficiency, additions to tax, and the additional interest arise from the disallowance of losses, investment credits, and energy credits claimed by petitioners with respect to the Clearwater Group partnership (Clearwater).

For a detailed discussion of the transactions involved in the Plastics Recycling group of cases, see Provizer v. Commissioner, T.C. Memo. 1992-177, affd. per curiam without published opinion 996 F.2d 1216 (6th Cir. 1993). The underlying

transactions involving the Sentinel recycling machines (recyclers) in petitioners' case are identical to the transactions in Provizer, and, with the exception of certain facts that we regard as having minimal significance, petitioners have stipulated substantially the same facts concerning the underlying transactions that were described in Provizer v. Commissioner, supra.

In transactions described in the Provizer case and stipulated by the parties herein, Packaging Industries of Hyannis, Massachusetts (PI), manufactured and sold[2] six Sentinel EPE[3] recyclers to ECI Corporation (ECI) for $981,000 each. PI manufactures thermoplastic and other types of packaging machinery, as well as energy saving devices. PI holds itself out as the world's largest manufacturer of blister packaging machinery and as fabricating the industry's widest line of thermoforming machinery. EPE recyclers are batch type machines designed to convert expanded low density polyethylene foam into a densified form called "popcorn" that can be further processed to produce resin pellets suitable for some uses in the plastics industry.

---

[2] Terms such as sale, lease, license, and sublicense, as well as their derivatives, are used for convenience only and do not imply that the particular transaction was in fact a sale, lease, license, or sublicense.

[3] EPE stands for expanded polyethylene.

The sales of the recyclers from PI to ECI were financed with nonrecourse notes. Approximately 7 percent of the sales price of the recyclers sold by PI to ECI was paid in cash, with the remainder financed through a 12-year nonrecourse note requiring equal monthly installments of $100,917, including annual interest at 19.8 percent with the first payment due 7 months after closing. ECI's purchase was subject to Clearwater's leasing agreement and FMEC's licensing agreement as set out below.

In the second part of the transaction, ECI resold the recyclers to F&G Corporation (F&G) for $1,162,667 each, of which less than about 7 percent was paid in cash. The balance was paid by a 12-year partial recourse note requiring equal monthly installments of $100,917, including annual interest at 15.4 percent. These notes provided that 10 percent of the notes were recourse but that the recourse portion of the notes was due only after the nonrecourse portion, 90 percent, was paid in full. The first payment on the note was due 7 months after the closing.

F&G's purchase was subject to Clearwater's agreement to enter into a lease with F&G and was subject to FMEC's agreement to enter into the license as set out below.

In the third part of the transaction, F&G leased the recyclers to Clearwater for 12 years, a lease term equal to 150 percent of the class life of the assets. Under the lease, the monthly rental payment was $100,917, with an initial amount of

$605,500 to be prepaid at the closing as rental for the first 6 months.

In the fourth step of the transaction, Clearwater licensed the recyclers to First Massachusetts Equipment Corp. (FMEC) for 12 years at a guaranteed minimum royalty of $100,917 per month beginning with the seventh month of the license plus a prepaid nonrefundable $20,500 advance royalty. After the recyclers were placed in service, the license required additional royalty payments based on a percentage of profits that might be realized on the sale or use of the resin pellets produced by the recyclers.

In the fifth step of the transaction, FMEC sublicensed the recyclers back to PI, the manufacturer, on a month-to-month basis for a royalty of $100,917 per month. The sublicense to PI was subject to most of the terms of the license from Clearwater to FMEC.

In the final step of the transaction, PI was to sublicense the recyclers to end-users who would use the recyclers to do the actual converting of their low density thermoplastic foam or film. The terms of the sublicense generally required the end-user to pay PI 100 percent of the recycled foam in exchange for a payment from FMEC based on the quality and amount of recycled scrap. PI was to control and be responsible for placing the recyclers with end-users and for arranging to collect or dispose

of the product of the recyclers.  Service and installation costs were to be borne by the end-user.  End-users were also required to use their best efforts to recycle 220 pounds an hour for 16 hours per week.  Only PI was to service or repair the recyclers.

No arm's-length negotiations for the price of the Sentinel EPE recyclers took place among PI, ECI, and F&G.  All of the monthly payments required among the entities in the above transactions offset each other.  These transactions occurred simultaneously.

Clearwater leased Sentinel EPE recyclers from F&G and licensed those recyclers to FMEC.  For convenience, we refer to the series of transactions among PI, ECI, F&G, Clearwater, and FMEC as the Clearwater transactions.

By private placement memorandum dated November 17, 1981, Clearwater offered subscriptions for 16 limited partnership units at $50,000 per unit.  The limited partners owned 99 percent of Clearwater, and the general partner, Samuel L. Winer, owned the remaining 1 percent.  Each limited partner was required to have a minimum net worth, exclusive of his principal home, furnishings, and automobiles, in the amount of $200,000 per limited partnership unit.  In addition, each partner was required to have enough income during the 1981 taxable year to place the limited partner in an income tax bracket of at least 50 percent.

In addition to the Clearwater transactions, a number of other limited partnerships entered into transactions similar to the Clearwater transactions.

B.  Individuals Involved

Samuel L. Winer (Winer) was the general partner of Clearwater and paid $1,000 for a 1-percent interest in all items of income, gain, deduction, loss, and credit arising from the operations of Clearwater.  Winer received $60,000 out of the proceeds of the Clearwater group private offerings as compensation for his services.

In 1981 Richard Roberts (Roberts) was a businessman and the general partner in a number of limited partnerships that leased EPE recyclers.  Roberts was also the general partner in a number of other limited partnerships that leased and licensed Sentinel recyclers.  He also was a 9-percent shareholder in F&G, the corporation that leased the recyclers to Clearwater.  From 1982 through 1985, Roberts and Raymond Grant (Grant) were in the business of promoting tax sheltered investments.  Grant was an investment banker, attorney, accountant, and the president and 100-percent owner of ECI.  Roberts and Grant together were general partners in other partnerships.  Prior to the Clearwater transactions, Roberts and Grant were clients of the accounting firm H.W. Freedman & Co. (Freedman & Co.).

Harris W. Freedman (Freedman), a certified public accountant and the named partner in Freedman & Co., was the president and chairman of the board of F&G. Freedman was experienced with leveraged leasing, and he owned 94 percent of a Sentinel EPE recycler.

Freedman & Co. prepared the tax returns for ECI, F&G, and Clearwater. Although Freedman & Co. did not prepare the initial financial projections included in the offering memorandum, Freedman did review the financial projections and made suggestions as to both format and substance.

Freedman & Co. also provided tax services to John D. Bambara (Bambara). Bambara was the 100-percent owner of FMEC, as well as its president, treasurer, clerk, and director. Bambara was also the president of PI and a member of its board of directors. He, his wife, and his daughter also owned directly or indirectly 100 percent of the stock of PI.

Elliot I. Miller (Miller) was the corporate counsel to PI. In 1981, Miller was also a shareholder of F&G. Miller represented Grant personally and Grant's clients who invested in other programs that Grant promoted. Miller was also an acquaintance of Winer.

John Y. Taggert (Taggert) was a well-known tax attorney and an adjunct professor at the New York University Law School. Taggert had been acquainted with Miller for about 15 years prior

to 1981. Miller recommended that Roberts employ Taggert and his firm as counsel to the general partner of Hyannis Recycling Associates, the initial plastics recycling partnership. Taggert and other members of his firm, Windels, Marx, Davies & Ives (WMDI), prepared private offering memoranda, tax opinions, and other legal documents for Clearwater and over 15 other plastics recycling partnerships. Taggert acquired a 6.66-percent interest in a second-tier Plastics Recycling partnership but only after his representation of Clearwater and other recycling partnerships had ended.

Robert Gottsegen (Gottsegen) was a businessman active in the plastics industry and a long-time business associate of Bambara. Miller represented Gottsegen and Bambara in several business transactions.

C.   The Private Offering Memorandum

Clearwater distributed to potential limited partners a private placement memorandum dated November 17, 1981. The offering memorandum listed significant business and tax risk factors associated with an investment in Clearwater. Specifically, the offering memorandum stated: (1) There was a substantial likelihood of audit by the Internal Revenue Service (IRS), and the purchase price paid by F&G to ECI probably would be challenged as being in excess of fair market value; (2) the partnership had no prior operating history; (3) the general

partner had no prior experience in marketing recycling or similar equipment; (4) the limited partners would have no control over the conduct of the partnership's business; (5) there was no established market for the Sentinel recyclers; (6) there were no assurances that market prices for virgin resin would remain at their current costs per pound or that the recycled pellets would be as marketable as virgin pellets; and (7) certain potential conflicts of interest existed.  The private offering memorandum also informed investors that the business of the partnership would be conducted in accordance with six simultaneous transactions.

The private offering memorandum stated that the projected tax benefits for the initial year of investment for an investor contributing $50,000 would be investment credits and energy credits in the aggregate amount of $86,328, plus deductions in the amount of $39,399.

The offering memorandum also included a discussion of the tax aspects of the transactions and a tax opinion prepared by WMDI concerning the tax issues involved in the Plastics Recycling Program.

Also included in the offering memorandum were the reports of the "F&G evaluators", Samuel Z. Burstein (Burstein) and Stanley Ulanoff (Ulanoff).

At the time Ulanoff prepared the report, he was a professor of marketing at Baruch College. Ulanoff is also the author of numerous books on technical and marketing subjects. His report covered the marketing value and potential of the recyclers and expressed the conclusion that the sales price paid by F&G for the recyclers and the rental payment made by Clearwater were fair and reasonable. His conclusion allegedly was based on his personal observation of the Sentinel EPE recycler prototype during a visit to PI, discussions with PI employees, the needs of the plastics industry, and his analysis of the economic projections provided in the offering memorandum.

Burstein was an associate professor of mathematics at New York University. Allegedly based on his visit to PI, discussions with PI personnel, an evaluation of the technical value of the recycler, the recycler's history of performance, and information concerning the use of recycled polyethylene as a raw material, Burstein concluded that the Sentinel EPE recycler was capable of recycling on a continuous basis.

The offering memorandum represented that the Sentinel recyclers were unique machines. However, they were not. Several machines capable of densifying low density materials were already on the market in 1981. Other plastics recycling machines available at that time ranged in price from $20,000 to $200,000, including the Foremost "Densilator", the Nelmor/Weiss

Densification System (Regenolux), the Buss-Condux Plastcompactor, and the Cumberland Granulator.  See Provizer v. Commissioner, T.C. Memo. 1992-177, and the discussion regarding expert testimony, infra.

D.    Expert Testimony

The parties did not agree on the value of the Sentinel EPE recyclers, and petitioners did not stipulate to be bound by the value of the Sentinel EPE recyclers that we found in Provizer v. Commissioner, supra.

At trial, petitioners did not offer expert testimony regarding the value of the recyclers.  In contrast, respondent offered expert testimony from Steven Grossman (Grossman) and Richard S. Lindstrom (Lindstrom).

1.    Grossman

Grossman is a professor in the Plastics Engineering Department at the University of Massachusetts at Lowell.  He has a bachelor of science degree in chemistry from the University of Connecticut and a doctorate degree in polymer science and engineering from the University of Massachusetts.  He also has more than 15 years of experience in the plastics industry, including more than 4 years of experience as a research and development scientist at the Upjohn Company in its Polymer Research Group.

Grossman is also a partner in the law firm of Hayes, Soloway, Hennessey, Grossman & Hage, P.C., which firm practices in the area of intellectual property, including patents, trademarks, copyrights, and trade secret protection.

Grossman's reports concerning the value of the Sentinel EPE recyclers discuss the limited market for the recycled plastic material.  Grossman concluded that these recyclers were unlikely to be successful products because of the absence of any new technology, the absence of a continuous source of suitable scrap, and the absence of any established market.  Grossman suggested that a reasonable comparison of the products available in the polyethylene industry in 1981 with the Sentinel EPE recyclers reveals that the recyclers had very little commercial value and were similar to comparable products available on the market in component form.  For these reasons, Grossman opined that the Sentinel EPE recyclers did not justify the "one-of-a-kind" pricetag that they carried.

Specifically, Grossman reported that there were several machines on the market as early as 1981 that were functionally equivalent to, and significantly less expensive than, the Sentinel EPE recyclers.  These machines included: (1) The Japan Repro recycler, available in 1981 for $53,000; (2) the Buss-Condux Plastcompactor, available before 1981 for $75,000; (3) Foremost Machine Builders' "Densilator", available from 1978-1981

for $20,000; and (4) the Midland Ross Extruder, available in 1980 and 1981 for $120,000. Grossman observed that all of these machines were "widely available".

Grossman's opinion regarding the Sentinel EPE recycler was based on the descriptions of such recycler as set forth in the writings of other professionals. Grossman neither tested nor examined the Sentinel EPE recycler.

Finally, Grossman reported on the relationship between the plastics industry and the petrochemical industry. Grossman noted that although the development of the petrochemical industry is a contributing factor in the growth of the plastics industry, the two industries have a "remarkable degree of independence". Grossman observed that the "oil crisis" in 1973 triggered "dire" predictions about the future of plastics that had not been fulfilled in 1981. Grossman stated that the cost of a plastic product depends, in large part, on technology and the price of alternative materials. Grossman's studies concluded that a 300-percent increase in oil prices results in a 30-40 percent increase in the cost of plastic.

Grossman did not specifically value the Sentinel EPE recycler. However, as previously stated, Grossman concluded that existing technology was available that provided equivalent capability of recycling polyethylene.

2.   <u>Lindstrom</u>

Lindstrom graduated from the Massachusetts Institute of Technology with a bachelor's degree in chemical engineering. From 1956 until 1989, Lindstrom worked for Arthur D. Little, Inc., in the areas of process and product evaluation and improvement and new product development, with special emphasis on plastics, elastomers, and fibers.  At the time of trial, Lindstrom continued to pursue these areas as a consultant.

In his report, Lindstrom determined that in 1981 several different types of equipment capable of recycling expanded polyethylene were available and priced at approximately $50,000. Lindstrom found that, on the basis of his research, "there were available in 1981 commercial units that could be purchased for $50,000 or less that were totally equal to the Sentinel EPE recycler in function, product quality, and capacity."

Lindstrom examined the Buss-Condux Plastcompactor and the Regenolux.  Lindstrom found that these machines were functionally equivalent to the Sentinel EPE recycler and were available in the years and at the prices reported by Grossman, detailed <u>supra</u>. Lindstrom also reported that various equipment companies, such as the Cumberland Engineering Division of John Brown Plastics Machinery, were willing to provide customized recycling programs to companies at a minimum cost of $50,000.

Lindstrom found that in "average-use situations" the Sentinel EPE recycler could process 200 pounds of plastic per hour.

Lindstrom observed a Sentinel EPE recycler in operation at PI, and he was allowed to take photographs of it and examine its blueprints.  Based on his observations and study, Lindstrom estimated that the manufacturing cost of the Sentinel EPE recycler was approximately $20,000.  Lindstrom concluded that the market value of the Sentinel EPE recycler did not exceed $50,000.

Lindstrom also reported that information was available in 1981 regarding state-of-the-art foamed plastic recycling machines.  Lindstrom described several approaches that might have been taken by a layman of average intelligence to obtain such information, even in a small town library.

E.    Petitioners and Their Introduction to Clearwater

Petitioners acquired a 1.547-percent interest in Clearwater in 1981 for $12,500.

Petitioner husband (petitioner) has a bachelor of science degree in chemical engineering.  During college, petitioner was employed during 2 summers by the Scott Paper Company.  There, he became familiar with batch type paper pulp machines used to process wood chips or recycled paper or cardboard into pulp.

Petitioner also has a J.D. degree. While in law school, petitioner was employed by a patent attorney and conducted numerous patent searches.

Petitioner was an associate, and subsequently a partner, of the law firm of Shea and Gould from 1966 until 1989. Petitioner wife (Mrs. Carroll) was not employed outside the home.

Petitioner was introduced to Clearwater and its general partner, Winer, by Mr. Hirschfield, a partner at Shea & Gould. Petitioner read the offering memorandum and the reports contained therein and discussed the investment with other partners at his firm, including Alan Parker, the senior tax attorney at the firm, who were investing, or considering investing, in the Plastics Recycling Program.

Petitioners had no knowledge concerning the plastics industry and/or plastics recycling. Petitioners did not see a Sentinel EPE recycler prior to their investment in Clearwater nor did they do a patent search on the EPE recyclers. Rather, petitioner was aware that the promoters had not applied for a patent for the recyclers but concluded it was because they wanted to keep their invention a trade secret. Petitioner relied almost exclusively on the Clearwater offering memorandum (and the reports of Burstein, Ulanoff and WMDI, contained therein) and Petitioner's assessment of those reports as accurate. Petitioner considered the caveats and warnings contained in the Clearwater

memorandum but concluded that for the most part they were boiler-plate and overstated, included only to protect the promoters.

Petitioners never made any profit from their investment in Clearwater. Petitioners did not contact the general partner, Winer, at any time after their investment to inquire why the investment did not generate the profits projected.

The projected tax benefits for the initial year of investment described in Clearwater's offering memorandum greatly exceeded petitioners' investment in Clearwater. In fact, the tax benefits actually claimed by petitioners on their tax return for the initial year of investment in Clearwater greatly exceeded their investment in the partnership. For 1981, petitioners claimed a loss of $9,995 as their distributive share of Clearwater's losses for the year, and they claimed an investment tax credit in the amount of $11,542 and an energy tax credit in the amount of $10,785.

In the notice of deficiency, respondent disallowed all the claimed deductions and credits relating to petitioners' Clearwater investment.

F.   Ultimate Finding of Fact

At all relevant times, the fair market value of the Sentinel EPE recyclers did not exceed $50,000 per machine.

OPINION

We have decided many Plastics Recycling cases.  The majority of these cases presented issues regarding additions to tax for negligence and valuation overstatement.  See Greene v. Commissioner, T.C. Memo. 1997-296;  Kaliban v. Commissioner, T.C. Memo. 1997-271;  Sann v. Commissioner, T.C. Memo. 1997-259 n.13 (and cases cited therein), affd. Addington v. Commissioner, 205 F.3d 54 (2d Cir. 2000).  We found the taxpayers liable for the addition to tax for valuation overstatement in all of those cases and liable for the additions to tax for negligence in the overwhelming majority of those cases.  In a limited number of cases, the taxpayers also contested the underlying deficiency arising from the disallowance of the losses and various credits with respect to their Plastics Recycling investment.  We sustained the Commissioner on the issue of the underlying deficiency in every one of those cases.

In Provizer v. Commissioner, T.C. Memo. 1992-177, the test case for the Plastics Recycling group of cases, this Court: (1) Found that each Sentinel EPE recycler had a fair market value not in excess of $50,000; (2) held that the Clearwater transaction was a sham because it lacked economic substance and a business purpose; (3) sustained the additions to tax for negligence under section 6653(a)(1) and (2); (4) sustained the addition to tax for valuation overstatement under section 6659 because the

underpayment of taxes was directly related to the overvaluation of the Sentinel EPE recyclers; and (5) held that losses and credits claimed with respect to the Clearwater Group were attributable to tax-motivated transactions within the meaning of section 6621(c).  In reaching the conclusion that the transaction lacked business purpose, this Court relied heavily upon the overvaluation of the Sentinel EPE recyclers.

In the notice of deficiency, respondent disallowed all of the claimed deductions and credits relating to petitioners' Clearwater investment.  Respondent's determination is presumptively correct, and petitioners bear the burden of proving otherwise.  See Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934).

Issue 1.  The Underlying Deficiency

Respondent determined that the integrated series of transactions involved in the Plastics Recycling Program, of which Clearwater was a part, was an economic sham.  Petitioners must therefore prove otherwise in order to prevail.

There is a complete failure by petitioners to prove that the Plastics Recycling Program in which Clearwater participated was not an economic sham.  As in Provizer v. Commissioner, supra, we rely heavily on the fact that the Sentinel EPE machines were highly overvalued, an issue with respect to which petitioners

bear the burden of proof but on which they provided no expert or other persuasive testimony. In this regard they rely simply on the Clearwater offering memorandum and ineffective cross-examination of respondent's expert witnesses to establish the value of the Sentinel EPE recyclers.

Similarly, petitioners failed to introduce persuasive evidence on pertinent factors to establish the economics of the transaction, such as the presence of arm's-length price negotiations, see Helba v. Commissioner, 87 T.C. 983, 1005-1007 (1986), affd. 860 F.2d 1075 (3d Cir. 1988); the relationship between the sales price and fair market value, see Zirker v. Commissioner, 87 T.C. 970, 976 (1986); the structure of the financing, see Helba v. Commissioner, supra at 1007-1011; the degree of adherence to contractual terms, see id. at 1011; and the reasonableness of the income projections, see Rice's Toyota World, Inc. v. Commissioner, 81 T.C. 184, 204-207 (1983), revd. in part and remanded on other issues 752 F.2d 89 (1985).

Petitioners contend that although they stipulated substantially the same facts concerning the underlying transactions that were described in Provizer v. Commissioner, supra, they did not agree to be bound by any findings or conclusions in Provizer. Although we do not hold petitioners to the Provizer decision as a matter of stipulation, there is nothing in this record to persuade us to reach a different

conclusion. Rather, there is ample evidence on the record in the present case to establish independently that the series of Plastics Recycling transactions, of which petitioners' Clearwater transaction was a part, constituted an economic sham. However, because petitioners have provided no further evidence nor any novel contention with respect to the underlying deficiency not previously considered in Provizer, we shall not revisit that opinion. Accordingly, we sustain respondent's determination for substantially identical reasons as in Provizer.

Issue 2. Section 6653(a)(1) and (2) Negligence

Respondent determined that petitioners are liable for additions to tax under section 6653(a)(1) and (2) with respect to the underpayment attributable to petitioners' investment in Clearwater. Petitioners have the burden of proof to show that they were not negligent. See Addington v. Commissioner, 205 F.3d 54 (2d Cir. 2000), affg. Sann v. Commissioner, T.C. Memo. 1997-259; Goldman v. Commissioner, 39 F.3d 402, 407 (2d Cir. 1994), affg. T.C. Memo. 1993-480; Luman v. Commissioner, 79 T.C. 846, 860-861 (1982); Bixby v. Commissioner, 58 T.C. 757, 791-792 (1972).

Section 6653(a)(1) and (2) imposes additions to tax if any part of the underpayment of tax is due to negligence or intentional disregard of rules or regulations. Negligence is defined as the failure to exercise the due care that a reasonable

and ordinarily prudent person would exercise under the circumstances. See Neely v. Commissioner, 85 T.C. 934, 947 (1985). The pertinent question is whether a particular taxpayer's actions are reasonable in light of the taxpayer's experience, the nature of the investment, and the taxpayer's actions in connection with the transactions. See Henry Schwartz Corp. v. Commissioner, 60 T.C. 728, 740 (1973). In this regard, the determination of negligence is highly factual. "When considering the negligence addition, we evaluate the particular facts of each case, judging the relative sophistication of the taxpayers as well as the manner in which the taxpayers approached their investment." Turner v. Commissioner, T.C. Memo. 1995-363.

Petitioners claimed operating losses and investment and energy tax credits relying almost exclusively on representations in the Clearwater offering memorandum. Petitioners did not hire an independent industry expert to evaluate the profitability of their investment, nor did they employ an accountant to verify the correctness of the position on their tax return.

Petitioners contend that because of petitioner's background in chemical engineering and patent law, he possessed sufficient expertise to evaluate the Clearwater transaction, making it unnecessary to hire an expert to do the same. Petitioners claim that petitioner drew on his background to conclude that the EPE recyclers were unique (based on the purportedly unique blade

angle design of the EPE recyclers and the purportedly unique chemical process used to recycle the material) and warranted the $1,162,667 price tag.

Although petitioner may have been more familiar with chemical processes because of his college degree--or with machine designs because of his limited patent law experience--than the average investor, it is clear that he did not have adequate plastics industry knowledge to evaluate the investment. See Addington v. Commissioner, supra. Petitioner did not have any expertise in plastics recycling or evaluation of machinery, including plastics recycling equipment, to evaluate competently the profitability of the Clearwater transaction.

We have found that the EPE recyclers did not have a fair market value of more than $50,000 and that the recyclers did not have any unique features warranting their exorbitant pricetag. By simply relying on petitioner's limited knowledge and experience, without independent research or consultation, petitioners never made an adequate effort to learn that the EPE recyclers were highly overvalued or the true nature of the transaction as a sham.

There is also no indication that petitioners invested the necessary time to gain the requisite expertise to evaluate their investment. Petitioners claim that petitioner discussed the investment with several partners in his firm, the majority of

whom were also investing in Clearwater or related plastics partnerships.  We have not been convinced that these were any more than half-hearted inquiries, or that any of these other individuals were qualified to opine on the profitability of the transaction.  See id.

Petitioners also assert that because of petitioner's background, it was reasonable for them to rely simply on the Clearwater offering memorandum, including the reports of Burstein, Ulanoff, and the tax opinion prepared by WMDI. Petitioners claim that petitioner was sufficiently knowledgeable to decipher those reports and to find their conclusions reasonable.  Petitioners contend that after reading those reports, petitioner concluded that the reports were accurate, and that there was nothing more an independent expert, or independent research, could tell petitioners that was not already in these reports.

We think it unreasonable for an educated and sophisticated investor, such as petitioner, to conclude that an independent expert cannot evaluate a deal more objectively than the individuals retained by insiders to draft the offering memorandum and the tax opinions contained therein.  "It is unreasonable for taxpayers to rely on the advice of someone who they should know has a conflict of interest."  Id. at 59; see Goldman v. Commissioner, 39 F.3d at 408; LaVerne v. Commissioner, 94 T.C.

637, 652-653 (1990), affd. without published opinion 956 F.2d 274 (9th Cir. 1992), affd. in part without published opinion sub nom. Cowles v. Commissioner, 949 F.2d 401 (10th Cir. 1991).

It is also clear that petitioners could not reasonably rely on the advice of the Plastics Recycling promoters with respect to the substantive merits or the tax treatment of items in connection with their investment in Clearwater. See Patin v. Commissioner, 88 T.C. 1086, 1131 (1987), affd. without published opinion 865 F.2d 1264 (5th Cir. 1989), affd. sub nom. Gomberg v. Commissioner, 868 F.2d 865 (6th Cir. 1989), affd. sub nom. Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), affd. per curiam without published opinion sub nom. Hatheway v. Commissioner, 856 F.2d 186 (4th Cir. 1988); Kleiger v. Commissioner, T.C. Memo. 1992-734. Advice from such individuals "is better classified as sales promotion". Vojticek v. Commissioner, T.C. Memo. 1995-444.

Petitioners also claim that their decision to invest was greatly influenced by the nature of the transaction, guaranteeing them a profit based on "conservative" assumptions regarding the price of resin and minimal output by the recyclers. Based on these assumptions, petitioners claim to have concluded that the circular nature of the transaction in fact guaranteed them a profit. In this regard, petitioners claim that the circuitous nature of the transaction did not alarm them because petitioner

concluded that the Clearwater transaction was set up to satisfy the safe harbor leasing rules.

Petitioners' contention is completely circular and flawed. Petitioners reached the conclusion that the Clearwater transaction virtually guaranteed them a profit based on assumptions contained in the Clearwater offering memorandum. Petitioners did not perform adequate research nor obtain advice from an independent expert regarding the price of resins, the quality of the resin processed by the EPE recyclers, or the quality of the EPE recyclers. What is more, petitioners' argument completely ignores any fair market value consideration.

The standard for measuring fair market value is the price at which the property would change hands between a hypothetical willing buyer and seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of the relevant facts. See United States v. Cartwright, 411 U.S. 546, 551 (1973). We have held that the fair market value of the Sentinel EPE recyclers did not exceed $50,000.

If petitioners had made any reasonable effort to determine the fair market value of the recyclers, they would have determined, as we have found, that the recyclers' pricetage of $1,162,667 was grossly inflated.[4] At that point, petitioners

---

[4] There were many factors to indicate that the Sentinel

(continued...)

would have become skeptical of the manner in which payments for the recycler were to be made through a complex series of offsetting payments.  Petitioners would also have inquired why the partnership would be willing to "invest" in machines at far in excess of their fair market value when it could invest in other much less expensive machines performing virtually the same functions as the EPE recyclers.  Inquiry may also have spurred petitioners to take more seriously the tax and business warnings in the offering memorandum which, for the most part, petitioners cavalierly dismissed as overly cautious and boilerplate.

Petitioners claim that petitioner closely studied the Clearwater offering memorandum and was aware of the nature of the transaction.  What petitioner should have realized, or what an independent expert would have told him, is that the Sentinel EPE recyclers were not offered to the general public, and therefore the $1,162,667 pricetag did not result from traditional supply and demand pricing.  See Provizer v. Commissioner, T.C. Memo.

---

[4](...continued)
recyclers were highly overvalued.  For example, the Sentinel recyclers were not unique.  Respondent's experts identified other machines that were not only functionally equivalent to the Sentinel recyclers but that were also significantly less expensive.  We have found that information regarding comparable, less expensive recyclers was widely available.  If a potential purchaser, especially a sophisticated one, had conducted a due diligence investigation into the Sentinel EPE recyclers, such potential purchaser should have learned that comparable, less expensive equipment existed and that the Sentinel EPE recyclers were overvalued.

1992-177. Rather, the promoters were free to assign arbitrarily a value to the recyclers to be used for the Plastics Recycling transactions.

The circular nature of the transaction offered an opportunity for abuse. With the exception of a minimal downpayment for the machines, the majority of the purchase price was in the form of a series of offsetting payments realized only through bookkeeping entries, there being no disincentive for the promoters to exaggerate the value of the recyclers. To the contrary, the high price of the machines assured high tax write-offs and was sure to attract investors for that very reason.

In fact, we are convinced that petitioners' investment in Clearwater was purely tax driven. The Clearwater offering memorandum emphasized projected tax savings. For the year in issue, for each $50,000 invested, the purchaser was projected to receive $86,328 in investment and energy tax credits and $39,399 in tax deductions. Petitioners claimed a reduction of taxes in the year of investment of over twice the amount of their investment. "A reasonably prudent person would have asked a qualified tax adviser if this windfall were not too good to be true." Provizer v. Commissioner, supra; see McCrary v. Commissioner, 92 T.C. 827 (1989). Petitioners did not act reasonably in claiming those benefits on their tax return without

making further inquiry and intentionally disregarded rules and regulations.

In view of his sophistication and educational background, petitioner should have been able to determine that the Sentinel EPE recyclers were not unique, that they were not worth the amount ascribed to them, and that Clearwater lacked economic substance and had no potential for profit. Taking all of the above factors into consideration, we think it is more likely than not that petitioners invested in Clearwater in an effort to generate tax benefits, rather than to make a profit. Therefore, under the circumstances of this case, petitioners failed to exercise due care in claiming loss deductions and tax credits with respect to Clearwater.

Upon consideration of the entire record, we hold that petitioners are liable for the additions to tax for negligence under section 6653(a)(1) and (2). Respondent is sustained on this issue.

Issue 3. Section 6659 Valuation Overstatement

Petitioners also contest the addition to tax for valuation overstatement under section 6659.

A value claimed on a return that exceeds the correct value by 150 percent or more constitutes a valuation overstatement. See sec. 6659(c). The Sentinel EPE recyclers were valued at

$1,162,667 each, but they did not, as we have found, have a value exceeding $50,000 per machine.

Although petitioners declined to stipulate the value of the Sentinel recyclers at issue, petitioners presented no probative evidence by way of expert testimony or otherwise to contradict the conclusions reached by respondent's experts. The record is devoid of any evidence indicating that petitioners conducted a meaningful investigation to value the Sentinel recyclers. We have extensively considered the value of the Sentinel EPE recycler and have concluded as an ultimate fact that the recyclers did not have a fair market value in excess of $50,000. See Provizer v. Commissioner, T.C. Memo. 1992-177. Having so concluded, it follows that there was a valuation overstatement under section 6659.

In view of the foregoing, we sustain respondent's determination that petitioners are liable for the addition to tax for valuation overstatement under section 6659.

Issue (4)  Section 6621(c) Additional Interest

Respondent determined that petitioners are liable for additional interest with respect to the underpayment attributable to petitioners' investment in Clearwater.

Section 6621(c), formerly section 6621(d), provides for an increased rate of interest if the underpayment of tax exceeds $1,000 and is attributable to a tax-motivated transaction as

defined in section 6621(c)(3).  The increased rate of interest is effective only with respect to interest accruing after December 31, 1984, notwithstanding that the transaction was entered into before that date.  See <u>Solowiejczyk v. Commissioner</u>, 85 T.C. 552 (1985), affd. per curiam without published opinion 795 F.2d 1005 (2d Cir. 1986); <u>Provizer v. Commissioner</u>, <u>supra</u>.

As we held in <u>Provizer</u>, a tax-motivated transaction includes any sham or fraudulent transaction.  See sec. 6621(c)(3)(A)(v).  We have held that the Plastics Recycling Program to which petitioners' 1981 underpayment is attributable was a sham transaction.  The tax-motivated increased rate of interest is therefore clearly applicable.  Accordingly, we sustain respondent's determination on this issue.[5]

Petitioners have made other arguments that we have considered in reaching our decision.  To the extent that we have not discussed these arguments, we find them to be without merit.

To reflect our disposition of the disputed issues,

<u>Decision will be entered</u>

<u>for respondent</u>.

---

[5]  We note that a tax-motivated transaction also includes any valuation overstatement within the meaning of sec. 6659(c). See sec. 6621(c)(3)(A)(i).  It is apparent that there was such a valuation overstatement in the present case.  See the discussion <u>supra</u>, under Issue (3), regarding sec. 6659.  Accordingly, respondent's determination could also be sustained on this alternative basis.