JOHN E. VOJTICEK, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Vojticek v. Commissioner
Docket No. 10135-88.
United States Tax Court
T.C. Memo 1995-444; 1995 Tax Ct. Memo LEXIS 444; 70 T.C.M. (CCH) 740; September 20, 1995, Filed *444 Decision will be entered for respondent. John E. Vojticek, pro se. Mario J. Fazio, for respondent. COHEN, Judge COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: Respondent determined deficiencies in, and additions to, petitioner's Federal income taxes as follows: Additions to Tax
Sec.
Sec.
Sec.
Sec.
Year
Deficiency
6653(a)
6653(a)(1)
6653(a)(2)
6659(a)
1980
$ 6,381
$ 319
-- --
$ 1,914
1981
3,869
-- $ 193
[1]
1,161
1983
1,057
-- 53
[2]
317
Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. After concessions by both parties, we must decide whether petitioner is liable for additions to tax for negligence under section 6653(a) for 1980 and sections 6653(a)(1) and 6653(a)(2) for 1981 and 1983. FINDINGS OF FACT Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference. At the time the petition was filed, petitioner *445 resided in Cleveland, Ohio. Petitioner is a high school graduate. During the years in issue, he was employed as a printing pressman. He earned $ 33,082.33 in 1980, $ 44,142 in 1981, and $ 22,006 in 1983 from this employment. In 1982, petitioner was permanently disabled by an accident. Petitioner first learned of Saxon Energy Corp. (Saxon) from John Graham (Graham) of Graham & Associates. Saxon was a corporation formed in 1981 to lease energy management systems to the public. (The Saxon program is discussed in detail in , affd. per order .) Petitioner had no experience or knowledge with respect to the acquisition, lease, production, installation, marketing, or use of energy management systems during the years in issue. Graham provided petitioner with a copy of the Saxon Energy Brain/Fuel Optimiser Equipment Leasing Program information memorandum and a copy of a document entitled "Frequently Asked Questions about the Energy Brain/Fuel Optimiser Equipment Leasing Program". These documents concentrated on the tax consequences of the program and explained *446 little about the energy system itself. Before investing in Saxon, petitioner conducted no independent investigation and sought no outside information on the system. Petitioner relied solely on the representations of Graham, whom petitioner knew would receive a commission from his investment in Saxon. On December 26, 1983, petitioner signed a lease application for the Energy Conservation/Fuel Optimiser. Petitioner executed an undated lease agreement with Saxon for a one-half interest in an Energy Brain/Fuel Optimiser System A-1 (System A-1 or the system). On December 27, 1983, petitioner completed a "Lessee's Qualification Questionnaire". Petitioner indicated on the questionnaire that he possessed "some" knowledge of business and financial matters. On the same date, petitioner, as lessee, signed a form entitled "Election to Pass Investment Tax Credit From Lessor to Lessee" (the election form). The election form was not signed by a Saxon representative. As part of this group of documents, petitioner also received a "Business Advisor's Questionnaire" completed by Graham. This document represented Graham's financial and consulting experience as 12 years in tax-advantaged real estate, *447 equipment leasing, and oil and gas projects. The system that was leased from Saxon was not to be used by petitioner. Rather, petitioner was to engage a management company that would in turn locate an end-user. The end-user would pay for the system by agreeing to split the amount of energy savings attributable to the system equally with petitioner. The end-user would pay the management company 50 percent of the annual energy savings as rent. The management company was to retain a fee of 15 percent of petitioner's share of the energy savings and to remit the balance to petitioner. Petitioner was then required to pay Saxon 75 percent of the remaining net income. Petitioner did not negotiate the amount of the lease payment to Saxon. Petitioner never received or saw any appraisals of the System A-1 before or after entering into the lease. Petitioner has never seen the system he leased from Saxon and does not know where the system is currently located. Under the terms of the lease, petitioner paid an advance guaranteed rental in the amount of $ 6,750 for the period December 31, 1983, through December 31, 1984, for his one-half interest in the System A-1. The term of the lease was 20 *448 years. Additional rentals under the lease were payable in the amount of 75 percent of petitioner's net revenues (a sum equal to gross revenues, less management fees, sales tax, and other reasonable third-party payments) from the exploitation of the System A-1, commencing 12 months after execution of the lease. The minimum annual rental for petitioner's one-half interest in the system was $ 4,250. If no net revenues were generated, petitioner was not required to make any lease payments, and the minimum rental would accrue, interest free, until paid from revenues. In the event minimum rentals for petitioner's one-half interest in the System A-1 aggregating $ 42,500 were not paid at the end of the 10th year of the lease, Saxon had the right to terminate the lease. In no event was petitioner to be held liable for the nonpayment of additional minimum rentals. The sole recourse of Saxon was the termination of the lease. Petitioner relied on Graham to select the management company for the system. A "Service Agreement" was entered into between petitioner and ALH Energy Management Corp. (ALH) on December 27, 1983. In a letter dated July 18, 1984, ALH informed petitioner that his system had *449 been placed in service in Lake Bluff, Illinois, during December 1983. Petitioner timely filed returns for 1980, 1981, and 1983. Petitioner's 1983 Federal income tax return was prepared by Graham. Form 3468, Computation of Investment Credit, was attached to petitioner's 1983 return, valuing his Saxon investment at $ 102,500. Petitioner claimed a $ 10,250 investment credit based on this valuation. Petitioner also attached a Schedule C to his 1983 Federal income tax return, claiming deductions relating to the Saxon investment, including lease expenses of $ 6,750, legal and professional services of $ 655, energy management fees of $ 338, and investment management fees of $ 88. On February 27, 1984, following Graham's advice, petitioner filed an Application for Tentative Refund (Form 1045) seeking to carryback the unused investment credit. Investment credit carrybacks were tentatively allowed for 1980 and 1981 in the amounts of $ 6,381 and $ 3,869, respectively. OPINION Section 6653(a) for 1980 and section 6653(a)(1) for 1981 and 1983 provide for an addition to tax equal to 5 percent of the underpayment of tax if any part of the underpayment is due to negligence or intentional disregard *450 of the rules or regulations. For 1981 and 1983, section 6653(a)(2) provides a further addition to tax equal to 50 percent of the interest due on the underpayment attributable to negligence. For purposes of the addition to tax, negligence is defined as the lack of due care or the failure to do what a reasonable and ordinarily prudent person would do under the circumstances. . Petitioner bears the burden of proving that respondent's determinations are erroneous. Rule 142(a); . Petitioner argues that his reliance on Graham's advice to invest in Saxon is a defense to the negligence asserted by respondent. "Reliance on professional advice, standing alone, is not an absolute defense to negligence, but rather a factor to be considered." , affd. , affd. . See , affg. . *451 Although Graham had 12 years of experience in tax-advantaged real estate, equipment leasing, and oil and gas projects, he had no experience in energy management systems. Furthermore, even if Graham had possessed the knowledge to analyze an investment in energy management systems, petitioner was aware that Graham had a financial stake, i.e., a commission, in any Saxon investments. The "professional advice" petitioner received from Graham is better classified as sales promotion. See . Petitioner further contends that the size of his investment in relation to his income level shows his careful consideration of the long-term profit potential of the Saxon investment, thus differentiating himself from the taxpayer in Schillinger. This line of reasoning supports a finding of negligence. The size of his investment leads us to the conclusion that a reasonable person in his position would have been more careful. In Schillinger, the Court sustained the additions to tax for negligence where the taxpayer was a "sophisticated and prosperous investor" who relied solely on the advice of those associated with *452 Saxon in making his investment. The taxpayer's level of experience, the degree of investigation of the transaction, and the nature of the investment are all factors to be considered. See (upholding the negligence addition to tax where, although the taxpayers had prior investment experience, their lack of knowledge of energy management programs like Saxon should have prompted an independent investigation). Petitioner had no experience or knowledge with respect to the acquisition, lease, production, installation, marketing, or use of energy management systems. Petitioner did not negotiate the lease payments to Saxon and never saw an appraisal of the system or the system itself. Petitioner's lack of knowledge regarding energy management systems coupled with his concern for his future financial well-being should have prompted petitioner to undertake an independent investigation prior to his Saxon investment. A prudent investor under such circumstances would not invest a high percentage of his income into a single investment without seeking independent advice if his concern was truly for his financial future and *453 not solely for the tax benefits. See ; cf. (taxpayers who had no prior investment experience and no post-secondary education sought advice regarding Saxon from the Better Business Bureau, the Securities and Exchange Commission, the Internal Revenue Service, an independent accountant, and a tax attorney). On its face, the Saxon investment should have raised serious questions for the ordinarily prudent investor. The reasonable investor could not have expected to invest $ 6,750 in December 1983 and receive $ 7,831 in related deductions and a $ 10,250 investment tax credit on his 1983 income tax return. See , affd. without published opinion sub nom. , affd. without published opinion . Petitioner has failed to persuade us that his reliance on Graham's advice alone was reasonable under the circumstances. Accordingly, we sustain respondent's *454 determination with respect to the additions to tax for negligence for each of the years in issue. Decision will be entered for respondent. Footnotes
1. 50 percent of the statutory interest on $ 3,869.↩
2. 50 percent of the statutory interest on $ 1,057.↩