T.C. Memo. 2000-339

UNITED STATES TAX COURT

MYRON BARLOW AND ARLENE BARLOW, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 4651-95, 4652-95,          Filed November 3, 2000.
       6393-95, 6394-95.

<u>Neal Nusholtz</u>, for petitioners.

<u>Alexandra E. Nicholaides</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

DAWSON, <u>Judge</u>:  These consolidated cases were assigned to
Special Trial Judge Robert N. Armen, Jr., pursuant to the
provisions of section 7443A(b)(5) of the Internal Revenue Code in

effect at the time of assignment and Rules 180, 181, and 183.[1]
The Court agrees with and adopts the opinion of the Special Trial
Judge, which is set forth below.

OPINION OF THE SPECIAL TRIAL JUDGE.

ARMEN, <u>Special Trial Judge</u>:  In so-called affected items
notices of deficiency, respondent determined additions to tax to
petitioners' Federal income taxes for the years and in the
amounts as shown below:

| | Additions to tax | | |
|------|------------------|------------------|----------|
| Year | Sec. 6653(a)(1) | Sec. 6653(a)(2) | Sec. 6659 |
| 1982 | $4,829 | [1] | $23,100 |
| 1983 | 49 | [1] | |
| 1984 | 22 | [1] | |
| 1985 | 25 | [1] | |

[1] 50 percent of the interest payable with
respect to the portion of the underpayment
which is attributable to negligence or
intentional disregard of rules or regulations.
The underpayments for the years in issue were
determined and assessed pursuant to a partnership-
level proceeding.  See secs. 6221-6233.  In the
present cases, respondent determined that the
entire underpayment for each of the years in
issue is attributable to negligence or intentional
disregard of rules or regulations.

---

[1]  Unless otherwise indicated, all subsequent section
references are to the Internal Revenue Code in effect for the
taxable years in issue, and all Rule references are to the Tax
Court Rules of Practice and Procedure.

After concessions by petitioners,[2] the issues remaining for decision are as follows:

(1) Whether petitioners are liable for additions to tax under section 6653(a)(1) and (2) for negligence or intentional disregard of rules or regulations.  We hold that they are.

(2) Whether assessment of additional interest under section 6621(c) without prior opportunity to contest such assessment violates the Due Process Clause of the Fifth Amendment.  We hold that it does not.

---

[2] Petitioners do not contest that the Sentinel EPS recyclers that are involved in these cases were overvalued.  See Gottsegen v. Commissioner, T.C. Memo. 1997-314; see also Ulanoff v. Commissioner, T.C. Memo. 1999-170.  Petitioners therefore concede that they are liable for the addition to tax for valuation overstatement under sec. 6659 for 1982.

Further, petitioners do not contest (other than on constitutional grounds) that they are liable for additional interest under sec. 6621(c) with respect to the underpayment for 1982.  See sec. 6621(c)(3)(A)(i), (v); Ulanoff v. Commissioner, supra.

Finally, it would appear that petitioners have abandoned their contention regarding the statute of limitations (the so-called Davenport issue) in view of the recent affirmance of this Court's opinion on that issue by the Court of Appeals for the Eleventh Circuit.  See Davenport Recycling Associates v. Commissioner, 220 F.3d 1255 (11th Cir. 2000), affg. T.C. Memo. 1998-347; see also Klein v. United States, 86 F. Supp.2d 690 (E.D. Mich. 1999); Clark v. United States, 68 F. Supp.2d 1333, 1342-1346 (N.D. Ga. 1999); Kohn v. Commissioner, T.C. Memo. 1999-150.  However, if we are mistaken in this regard, then we refer the parties to paragraph 3 of the stipulation of facts, and we decide the Davenport issue in respondent's favor based on the foregoing precedent.

## FINDINGS OF FACT[3]

Some of the facts have been stipulated, and they are so found. The stipulated facts and attached exhibits are incorporated herein by this reference.

Petitioners resided in Grosse Pointe Farms, Michigan, at the time that each of their petitions was filed with the Court.

A. The Dickinson Transactions

These cases are part of the Plastics Recycling group of cases. In particular, the additions to tax arise from the disallowance of losses, investment credits, and energy credits claimed by petitioners with respect to a partnership known as Dickinson Recycling Associates (Dickinson or the partnership).

For a detailed discussion of the transactions involved in the Plastics Recycling group of cases, see Provizer v. Commissioner, T.C. Memo. 1992-177, affd. per curiam without published opinion 996 F.2d 1216 (6th Cir. 1993). The underlying transactions involving the Sentinel recycling machines (recyclers) in petitioners' cases are substantially identical to the transactions in Provizer v. Commissioner, supra, and, with the exception of certain facts that we regard as having minimal

_____

[3] At trial, we deferred ruling on certain evidentiary objections made by counsel for both parties. Our findings reflect our action sustaining petitioners' relevancy objection to questions regarding Fillmore Land Development and overruling respondent's relevancy objection to matters described in sec. "K." of our Findings of Fact, infra.

significance, petitioners have stipulated substantially the same facts concerning the underlying transactions that were described in Provizer v. Commissioner, supra.

In a 4-step series of simultaneous transactions closely resembling those described in Provizer and stipulated by the parties herein, Packaging Industries of Hyannis, Massachusetts (PI) manufactured and sold[4] four Sentinel EPS[5] recyclers to ECI Corp. (ECI) for $1,520,000 each. ECI simultaneously resold the recyclers to F&G Corp. (F&G) for $1,750,000 each. F&G simultaneously leased the recyclers to Dickinson. Finally, Dickinson simultaneously entered in a joint venture with PI and Resin Recyclers, Inc. (RRI) to "exploit" the recyclers and place them with end-users. Under this latter arrangement, PI was required to pay Dickinson a monthly joint venture fee.

For convenience, we refer to the series of transactions

---

[4] Terms such as sale and lease, as well as their derivatives, are used for convenience only and do not imply that the particular transaction was a sale or lease for Federal tax purposes. Similarly, terms such as joint venture and agreement are also used for convenience only and do not imply that the particular arrangement was a joint venture or an agreement for Federal tax purposes.

[5] EPS stands for expanded polystyrene. Provizer v. Commissioner, T.C. Memo. 1992-177, involved Sentinel expanded polyethylene (EPE) recyclers. However, the EPS recycler partnerships and the EPE recycler partnerships are essentially identical. See Davenport Recycling Associates v. Commissioner, T.C. Memo. 1998-347, affd. 220 F.3d 1255 (11th Cir. 2000); see also Gottsegen v. Commissioner, T.C. Memo. 1997-314 (involving both the EPE and EPS recyclers); Ulanoff v. Commissioner, T.C. Memo. 1999-170 (same).

between and among PI, ECI, F&G, Dickinson, and RRI as the Dickinson transactions.

The sales of the Sentinel EPS recyclers from PI to ECI were financed using 12-year nonrecourse notes. The sales of the recyclers from ECI to F&G were financed using 12-year "partial recourse" notes; however, the recourse portion of the notes was payable only after the first 80 percent of the notes, the nonrecourse portion, was paid. No arm's-length negotiations for the price of the recyclers took place between, or among, PI, ECI and F&G.

At the closing of the Dickinson transaction, PI, ECI, F&G, Dickinson, and RRI entered into arrangements whereby PI would pay a monthly joint venture fee to Dickinson, in the same amount that Dickinson would pay as monthly rent to F&G, in the same amount that F&G would pay monthly on its note to ECI, in the same amount that ECI would pay monthly on its note to PI. Further, in connection with the closing of the Dickinson transaction, PI, ECI, F&G, Dickinson, and RRI entered into offset agreements so that the foregoing payments were bookkeeping entries only and were never in fact paid. Also in connection with the closing of the Dickinson transaction, PI, ECI, F&G, Dickinson, and RRI also entered into cross-indemnification agreements.

B.    <u>Individuals Involved</u>

Richard Roberts (Roberts) was a businessman and the general partner in a number of limited partnerships that leased Sentinel EPE recyclers.  Roberts was also a 9-percent shareholder in F&G, the corporation that leased the recyclers to Dickinson in the Dickinson transactions.

Raymond Grant (Grant) was an investment banker, attorney, and accountant.  Grant was also the president and sole owner of ECI, the corporation that sold the recyclers to F&G in the Dickinson transactions.

From 1982 through 1985, Roberts and Grant were in the business of promoting tax-sheltered investments.  Roberts and Grant also served as general partners in other investments. Before the Dickinson transactions, Roberts and Grant were clients of the accounting firm H.W. Freedman & Co. (Freedman & Co.).

Harris W. Freedman (Freedman), a certified public accountant and the named partner in Freedman & Co., was the president, chairman of the board, and 9.1 percent owner of F&G.  Freedman was experienced with leveraged leasing, and he owned 94 percent of a Sentinel EPE recycler.

Freedman & Co. prepared the tax returns for ECI, F&G, and Clearwater Group, the partnership that was involved in <u>Provizer</u> <u>v. Commissioner</u>, <u>supra</u>.  Although Freedman & Co. did not prepare the initial financial projections included in the Dickinson

private placement offering memorandum, Freedman & Co. reviewed those financial projections and made suggestions as to format and substance.

Freedman & Co. also provided tax services to John D. Bambara (Bambara). Bambara was the president and sole owner of First Massachusetts Equipment Corp. (FMEC Corp.), another entity that was involved in Provizer v. Commissioner, T.C. Memo. 1992-177. Bambara was also the president of PI and a member of its board of directors and with his wife and daughter owned 100 percent of the stock of PI, the corporation that sold the recyclers to ECI in the Dickinson transactions.

Elliot I. Miller (Miller), a practicing attorney who was experienced in tax matters, was the corporate counsel to PI. Miller represented Grant personally and Grant's clients who invested in programs that Grant promoted. Miller met Grant in the 1970's when Grant was involved in marketing a coal mine. Miller was also a 9.1-percent owner of F&G.

John Y. Taggert (Taggert) was a well-known tax attorney, the head of the tax department of the New York law firm of Windells, Marx, Davis & Ives, and an adjunct professor of tax law at the New York University Law School. Taggert had been acquainted with Miller for many years before 1982. Miller recommended that Roberts employ Taggert and his firm as counsel to the general partner in the initial Plastics Recycling partnership. Taggert

and other members of his firm prepared the offering memorandum, tax opinion, and other legal documents for Dickinson. Taggert owned a 6.66-percent interest in a second-tier Plastics Recycling partnership.

Robert Gottsegen (Gottsegen) was a businessman active in the plastics industry and a long-time business associate of Bambara. Gottsegen was the sole owner of RRI, the corporation that was involved in the joint venture in the Dickinson transactions, and a 9.1-percent owner of F&G. Gottsegen was the owner of several Sentinel recyclers and also the petitioner in Gottsegen v. Commissioner, T.C. Memo. 1997-314.

Samuel L. Winer (Sam Winer or Winer) was Dickinson's general partner and tax matters partner. Winer purportedly paid $1,000 for a 1-percent interest in all items of income, gain, deduction, loss, and credit of the partnership. For his services, Winer received $62,000 from the proceeds of the private placement offering.

C.   The Private Offering Memorandum

By a private placement offering memorandum dated October 26, 1982 (the offering memorandum), subscriptions for 18 limited partnership units in Dickinson were offered by the partnership's promoter to potential limited partners at $50,000 per partnership unit. Pursuant to the offering memorandum, the limited partners would own 99 percent of Dickinson and the general partner, Winer,

would own the remaining 1 percent.  Pursuant to the offering memorandum, each limited partner was required to have a net worth (including residence and personal property) in excess of $1 million, or net income in excess of $200,000, for each investment unit.

The offering memorandum stated that Dickinson would pay "fees of purchaser representatives and selling commissions" from the proceeds of the offering in an amount equal to 10 percent of the aggregate price of the units.

The offering memorandum also stated that Dickinson could pay professional fees to "Fred Gordon, Esq., Special Counsel to the General Partner", in an amount equal to 5 percent of the aggregate price of the units.  Gordon provided legal services to the partnership for which he was compensated.

The face of the offering memorandum warned, in bold capital letters, that **"THIS OFFERING INVOLVES A HIGH DEGREE OF RISK"**. The offering memorandum also warned that "An investment in the partnership involves a high degree of business and tax risks and should, therefore, be considered only by persons who have a substantial net worth and substantial present and anticipated income and who can afford to lose all of their cash investment and all or a portion of their anticipated tax benefits."  The offering memorandum went on to enumerate significant business and tax risks associated with an investment in Dickinson.  Among

those risks, the offering memorandum stated: (1) There was a substantial likelihood of audit by the Internal Revenue Service, and the purchase price paid by F&G to ECI might be challenged as being in excess of the fair market value; (2) the partnership had no prior operating history; (3) the general partner had no prior experience in marketing recycling or similar equipment; (4) the limited partners would have no control over the conduct of the partnership's business; (5) there were no assurances that market prices for virgin resin would remain at their current costs per pound or that the recycled pellets would be as marketable as virgin pellets; and (6) certain potential conflicts of interest existed.

The offering memorandum informed investors that the Dickinson transactions would be executed simultaneously.

The offering memorandum prominently touted the anticipated tax benefits for the initial year of investment for an investor in the partnership.  In this regard, the offering memorandum stated, in part, as follows:

> The principal tax benefits expected from an investment in the Partnership are to be derived from the Limited Partner's share of investment and energy tax credits and tax deductions expected to be generated by the Partnership in 1982. The tax benefits on a per Unit basis are as follows:

|      | Payment | Projected Regular Investment and Energy Tax Credits | Projected Tax Deductions |
|------|---------|-----------------------------------------------------|--------------------------|
| 1982 | $50,000 | $77,000                                             | $38,940                  |

> The Limited Partners are not liable for any additional payment beyond their cash investment for their Units, nor

are they subject to any further assessment.

The offering memorandum also included a tax opinion prepared by the law firm of Boylan & Evans concerning the tax issues involved in the Plastics Recycling program.  William A. Boylan and John D. Evans were formerly partners at Windells, Marx, Davis & Ives before leaving in 1982 and forming their own law firm.

Also included in the offering memorandum were the reports of two "evaluators", Samuel Z. Burstein (Burstein) and Stanley Ulanoff (Ulanoff).  Burstein was a professor of mathematics at New York University.  Burstein's report concluded that the Sentinel EPS recyclers were capable of continuous recycling.  The report also concluded that the recycling system would yield a material having commercial value.

At the time Ulanoff prepared his report, he was a professor of marketing at Baruch College and also the author of numerous books on technical and marketing subjects.  Ulanoff's report concluded that the price paid by F&G for the Sentinel EPS recyclers, the rent paid by Dickinson, and the joint venture profits were all fair and reasonable.

Burstein owned a 5.82-percent interest in another Plastics Recycling partnership that leased Sentinel EPS recyclers. Ulanoff owned interests in other Plastics Recycling partnerships

that leased both Sentinel EPS and EPE recyclers.[6]

The offering memorandum represented that Sentinel EPS recyclers were unique machines. However, they were not. Several machines capable of densifying low density materials were already on the market in 1982. Other plastics machines available at that time ranged in price from $20,000 to $200,000, including the Foremost "Densilator", the Nelmor/Weiss Densification System (Regenolux), the Buss-Condux Plastcompactor and the Cumberland Granulator. See Provizer v. Commissioner, T.C. Memo. 1992-177, and the discussion regarding expert reports, infra. Moreover, the recyclers were incapable of recycling expanded polystyrene by themselves and had to be used in connection with extruders and pelletizers.

D.   Expert Reports

At trial, petitioners did not offer expert testimony regarding the value of the recyclers. Rather, petitioners stipulated to the expert reports prepared by respondent's experts Steven Grossman (Grossman) and Richard S. Lindstrom (Lindstrom). Grossman and Lindstrom testified in Provizer v. Commissioner, supra, and a number of other Plastics Recycling cases.

1. Grossman

Grossman is a professor in the Plastics Engineering

_____

[6] Ulanoff was also the petitioner in Ulanoff v. Commissioner, T.C. Memo. 1999-170.

Department at the University of Massachusetts at Lowell. He has a bachelor of science degree in chemistry from the University of Connecticut and a doctorate degree in polymer science and engineering from the University of Massachusetts. He also has more than 15 years of experience in the plastics industry, including more than 4 years of experience as a research and development scientist at the Upjohn Co. in its Polymer Research Group.

Grossman is also a partner in the law firm of Hayes, Soloway, Hennessey, Grossman & Hage, P.C. The firm practices in the area of intellectual property, including patents, trademarks, copyrights, and trade secret protection.

Grossman's report concerning the value of the Sentinel EPS recyclers discusses the limited market for the recycled plastic material. Grossman concluded that these recyclers were unlikely to be successful products because of the absence of any new technology, the absence of a continuous source of suitable scrap, and the absence of any established market. Grossman suggested that a reasonable comparison of the products available in the polystyrene industry in 1982 with the Sentinel EPS recyclers reveals that the recyclers had very little commercial value and were similar to comparable products available on the market in component form. For these reasons, Grossman opined that the Sentinel EPS recyclers did not justify the "one-of-a-kind" price

tag that they carried.

Specifically, Grossman reported that there were several machines on the market as early as 1981 that were functionally equivalent to, and significantly less expensive than the Sentinel EPS recyclers. These machines included: (1) The Japan Repro recycler, available in 1981 for $53,000; (2) the Buss-Condux Plastcompactor, available before 1981 for $75,000; (3) Foremost Machine Builders' "Densilator", available from 1978-1981 for $20,000; and (4) the Midland Ross Extruder, available in 1980 and 1981 for $120,000. Grossman observed that all of these machines were "widely available".

Grossman examined both the Sentinel EPS recycler and a Japan Repro recycler and found that the construction of the two machines was "nearly identical". Further, Grossman concluded that the recycled polystyrene produced by both machines would also be nearly identical. In Grossman's opinion, neither the Japan Repro recycler nor the Sentinel EPS recycler represented "a serious effort at recycling" because the end-product from both machines was not completely devolatized and required further processing. It was also Grossman's opinion that an individual who seriously wanted to recycle would not purchase either of these machines.

Grossman's opinion regarding the Sentinel EPS recycler was based on his personal examination of a Sentinel EPS recycler, as

well as the descriptions of such recyclers as set forth in the writings of other professionals. Grossman did not, however, observe the Sentinel EPS recycler in actual operation.

Finally, Grossman reported on the relationship between the plastics industry and the petrochemical industry. Grossman noted that although the development of the petrochemical industry is a contributing factor in the growth of the plastics industry, the two industries have a "remarkable degree of independence". Grossman observed that the "oil crisis" in 1973 triggered "dire" predictions about the future of plastics that had not been fulfilled in 1981. Grossman stated that the cost of a plastic product depends, in large part, on technology and the price of alternative materials. Grossman's studies concluded that a 300 percent increase in oil prices results in a 30 to 40 percent increase in the cost of plastic.

Grossman did not specifically value the Sentinel EPS recycler. However, as previously stated, Grossman concluded that existing technology was available that provided equivalent capability of recycling polystyrene. Specifically regarding the Sentinel EPS recycler, Grossman also concluded that recycling equipment that achieved the same result as the Sentinel EPS recycler sold for about $50,000 during the relevant period.

2. Lindstrom

Lindstrom graduated from the Massachusetts Institute of

Technology with a bachelor's degree in chemical engineering. From 1956 until 1989, Lindstrom worked for Arthur D. Little, Inc., in the areas of process and product evaluation and improvement and new product development, with special emphasis on plastics, elastomers, and fibers. At the time of trial, Lindstrom continued to pursue these areas as a consultant.

In his report, Lindstrom determined that several different types of equipment capable of recycling expanded polystyrene were available and priced between $25,000 and $100,000 in 1982. With respect to the Sentinel EPS recycler in 1982, Lindstrom stated: "Several machines were available that could reprocess EPS into higher quality, more useful, higher value product and these machines or processing systems cost $50,000 to $100,000."

Lindstrom examined the Buss-Condux Plastcompactor and the Regenolux. Lindstrom found that these machines were functionally equivalent to the Sentinel EPS recycler and were available in the years and at the prices reported by Grossman, detailed supra. Lindstrom also reported that various equipment companies, such as the Cumberland Engineering Division of John Brown Plastics Machinery, were willing to provide customized recycling programs to companies at a minimum cost of $50,000.

Lindstrom found that the Sentinel EPS recycler could process between 100 and 200 pounds of plastic per hour.

Lindstrom observed a Sentinel EPS recycler in operation and

was allowed to inspect the machine closely.  Lindstrom estimated the manufacturing cost of the Sentinel EPS recycler to be approximately $20,000 and the market value of the machine to be approximately $25,000.

E.  Fair Market Value of the Recyclers

At all relevant times, the fair market value of the Sentinel EPS recyclers did not exceed $50,000 per machine.

F.  Petitioners and Their Introduction to Dickinson

Petitioner Myron Barlow (petitioner) is a highly educated individual.  Petitioner received a bachelor's degree from John Hopkins University in Baltimore, Maryland, and a medical degree from the University of Michigan School of Medicine in Ann Arbor, Michigan.  He then completed a 3-year residency program in dermatology at Wayne State University in Detroit, Michigan.  Thereafter he began the private practice of medicine as a Board-certified dermatologist.  He practiced his profession during the years in issue and until he retired in 1997.

Petitioner is also a financially successful individual.  During the years in issue, petitioner received compensation from his professional corporation, Gross Pointe Dermatology Associates, as follows:

| Year | Compensation |
|------|------------|
| 1982 | $294,263 |
| 1983 | 348,630 |
| 1984 | 250,000 |
| 1985 | 356,590 |

During the years in issue, petitioner Arlene Barlow was not generally employed outside the home.  She did receive some minimal compensation in 1984 and 1985 working for petitioner's professional corporation.

Petitioner is also a sophisticated investor.  Prior to purchasing a partnership interest in Dickinson, petitioner's investment portfolio included a variety of interests.  For example, petitioner owned stock in a closely held corporation, DOTT Manufacturing Co., that formed plastic products for the automobile industry.[7]  Petitioner also owned partnership interests in Wilmington Associates, a "land type of investment" in North Carolina; 16-75 Land Co., "an investment in an office building" in Michigan; and Stonebridge Manor Properties, a partnership whose business is not described in the record.  Petitioner also owned an interest in Greater Mary, an operating coal mine in Pennsylvania.  In addition, petitioner owned stocks and bonds, including municipal bonds, as well as a communications system that he rented to a medical clinic.

---

[7]  On their income tax return for 1985, petitioners reported gain from the sale of stock in Dott in the amount of $222,349, based on a gross sales price of $287,034 and cost or other basis, plus expense of sale, in the amount of $64,685.

In December 1982, at or about the time he invested in Dickinson, petitioner also invested $50,000 in a business known as Real Estate Financial Corp.

Petitioner was introduced to Dickinson in November 1982 by Herbert Krickstein (Krickstein), a friend and medical colleague, and Fred Gordon (Gordon), an attorney, while on a golf vacation in Florida. At the time, Gordon was Krickstein's attorney; Gordon was also actively engaged in selling interests in partnerships such as Dickinson and was the "Fred Gordon, Esq." who was identified in the Dickinson offering memorandum as "Special Counsel to the General Partner". Gordon never represented that he had any specialized knowledge about plastics recycling.

After his return from Florida, petitioner received a letter from Gordon dated November 30, 1982, enclosing a copy of the offering memorandum. Petitioner "browsed" through portions of the offering memorandum, but he did not read it. Rather, he consulted with Philip Nusholtz (Nusholtz), an attorney with whom he had a long-standing professional relationship and whose judgment he respected and whose advice he valued.[8] Nusholtz also did not read the offering memorandum; however, he advised petitioner not to invest in any promotion marketed by Gordon but

---

[8] Philip Nusholtz was the father of petitioners' counsel Neal Nusholtz.

instead to focus on more conservative investments.

Petitioner then took the offering memorandum to his accountant and return preparer, Gerald Kabeck (Kabeck), a C.P.A., who read it and thought that the investment was reasonable. At the time, Kabeck had no specialized knowledge or experience in plastics materials or plastics recycling and no specialized knowledge in valuing plastics recycling machines such as the Sentinel EPS recycler. Petitioner did not pay Kabeck for his advice.

In December 1982, petitioner signed a subscription agreement and purchased one limited partnership unit (a 5.5-percent interest) in Dickinson for $50,000. In signing the subscription agreement, petitioner assumed that the purchaser representative was Gordon.

Petitioner did not, before signing the subscription agreement and investing in Dickinson, make any independent investigation of the fair market value of the Sentinel EPS recycler, nor did he seek the advice of any expert in the plastics industry. Petitioner was influenced to sign the subscription agreement because he assumed that Krickstein and other medical colleagues were investing in Dickinson. However, petitioner did not have any specific conversations with his colleagues about either Dickinson or plastics recycling before making the investment. Petitioner did not think that his medical

colleagues had any specialized knowledge in plastics recycling or in plastics recycling machines such as the Sentinel EPS recycler.[9]

At the time that he signed the subscription agreement and invested in Dickinson, petitioner did not have any education or work experience in either plastics materials or plastics recycling, nor did petitioner have any specialized knowledge about either the plastics industry in general or the EPS recycler in particular.

In contrast, at the time that he signed the subscription agreement, petitioner knew that his investment in Dickinson offered immediate tax benefits in excess of his $50,000 investment. Petitioner had not previously made any investment that offered immediate tax benefits in excess of his investment. Petitioner was influenced to invest in Dickinson by the tax benefits described in the offering memorandum.

G. Ultimate Finding Regarding Petitioner's Motivation

Petitioner invested in Dickinson principally because the investment offered immediate tax benefits in excess of his investment.

H. Petitioners' Tax Returns

The tax benefits claimed by petitioners on their Federal

---

[9] There is nothing in the record to suggest that petitioner's medical colleagues had any specialized knowledge.

income tax return for 1982, the initial year of investment in Dickinson, exceeded their $50,000 investment in the partnership. Thus, on their 1982 return, petitioners claimed a regular investment credit and an energy investment credit in the aggregate amount of $77,001 in respect of the recyclers. Petitioners also claimed a loss in the amount of $39,155 for their distributive share of the partnership's reported loss for 1982. The investment credits and the partnership loss served to reduce petitioners' liability for Federal income tax as reported on their 1982 return by $96,583.

Petitioners also claimed losses on their Federal income tax returns for 1983 through 1985 for their distributive share of Dickinson's reported losses for those years as follows:

| Year | Loss Claimed |
|------|--------------|
| 1983 | $1,961 |
| 1984 | 866 |
| 1985 | 1,014 |

Petitioner never made a profit in any year from his investment in Dickinson.

I.  The Partnership-level Proceeding

Dickinson was a so-called TEFRA partnership subject to the unified partnership audit and litigation procedures set forth in sections 6221 through 6233. See Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. 97-248, sec. 402(a), 96 Stat. 648. On May 15, 1989, respondent mailed a Notice of Final Partnership Administrative Adjustment (FPAA) to Sam Winer,

the tax matters partner of the Dickinson partnership, for each of the taxable years 1982 through 1985. A copy of each FPAA was also mailed to petitioners.

The FPAA's advised petitioners of adjustments that respondent proposed to make to the partnership returns (Forms 1065) filed by Dickinson. Specifically, the FPAA's disallowed all deductions and credits claimed by Dickinson in connection with its plastics recycling activities for 1982 through 1985. Each of the FPAA's also advised petitioners that they could agree to the adjustments or, if they did not agree, how review could be obtained by the tax matters partner, or by notice partners such as petitioner, in this Court. Each of the FPAA's also included a page entitled "For Information Purposes Only", which provided as follows:

> It has been determined that the partnership has improperly taken deductions or credits based on the overvaluation of assets and based on positions taken for which substantial authority was lacking. It has also been determined that the transactions were entered into for tax motivated reasons and adjustments to the partnership items were due to negligence or intentional disregard of rules and regulations. Penalties based on the above transactions, including but not limited to Internal Revenue Code sections 6659, 6661, 6621(c), and 6653(a)(1)&(2), are applicable at the individual partner level and will be raised in separate proceedings at the partner level following the present partnership proceedings.

> A Court will not have jurisdiction to consider these partner penalties raised in a petition with respect to this Notice of Final Partnership Administrative Adjustment (FPAA) pursuant to Internal Revenue Code sections 6226(f) and 6231(a)(3). Thus,

you should not raise any penalty issues should you decide to petition the Tax Court with respect to this FPAA.

On June 12, 1989, a case was commenced in this Court at docket No. 13191-89 and captioned "Dickinson Recycling Associates, Sam Winer, Tax Matters Partner, Petitioner v. Commissioner of Internal Revenue, Respondent".[10]  Subsequently, on February 23, 1994, the Court entered decision in the Dickinson case pursuant to the Commissioner's Motion for Entry of Decision under Rule 248(b).  The Court's decision, which reflected the full concession by Dickinson of all items of income, loss, and the underlying valuation for the recyclers for 1982 through 1985, completely sustained the Commissioner's FPAA determinations for those years.

J.  Payment of Additional Interest by Petitioners

In November 1994, after the Court's decision in the partnership action at docket No. 13191-89 became final, respondent mailed a letter to petitioners advising them that their amended return related to Dickinson for the taxable year 1982 had been accepted as filed[11] and that the provisions of

---

[10]  All of the limited partners of Dickinson who had an interest in the outcome of the partnership proceeding were treated as parties to the proceeding.  See sec. 6226(c) and (d).  See also Title XXIV, Tax Court Rules of Practice and Procedure, regarding partnership actions.

[11]  In September 1988, petitioners amended their income tax returns for 1982 through 1985.  Copies of those returns are not
(continued...)

section 6621 regarding additional interest would apply to that taxable year. The letter went on to state as follows:

> Section 6621(c) IRC
> Since the underpayment of tax is attributable to a tax motivated transaction, the interest to be applied to any underpayment after 12-31-84 is 120% of the adjusted rate of interest established under IRC Section 6621(c). The amount of the underpayment attributable to the tax motivated transactions is $96,583.00.

Thereafter, by Notice dated December 12, 1994, respondent billed petitioners for additional interest under section 6621(c) for the taxable year 1982 in the amount of $27,914. Petitioners protested the assessment of additional interest without having prior opportunity to contest the assessment; nevertheless, they paid the $27,914 amount on December 27, 1994.

K. Collateral Litigation

In December 1988, a few months after petitioners amended their income tax returns for 1982 through 1985, petitioner and several of his medical colleagues commenced a civil action for damages against Gordon, as well as Boylan & Evans, the law firm that authored the tax opinion in the offering memorandum,[12] in respect of Dickinson and two other Plastics Recycling partnerships. This action was settled by the parties thereto

---

[11](...continued) part of the record. Apparently, petitioners foresaw an adverse outcome of a likely TEFRA partnership action and amended their returns in order to satisfy anticipated underpayments of tax attributable to the Dickinson investment.

[12] See supra sec. "C.".

prior to trial. Neither the date on which the action was settled nor the amount for which it was settled is disclosed in the record before us.

OPINION

We have decided many Plastics Recycling cases. Most of these cases have presented issues regarding additions to tax for negligence and valuation overstatement. See, e.g., <u>Carroll v. Commissioner</u>, T.C. Memo. 2000-184; <u>Ulanoff v. Commissioner</u>, T.C. Memo. 1999-170; <u>Gottsegen v. Commissioner</u>, T.C. Memo. 1997-314; <u>Greene v. Commissioner</u>, T.C. Memo. 1997-296; <u>Kaliban v. Commissioner</u>, T.C. Memo. 1997-271; <u>Sann v. Commissioner</u>, T.C. Memo. 1997-259 n.13 (and cases cited therein), affd. <u>Addington v. Commissioner</u>, 205 F.3d 54 (2d Cir. 2000). We found the taxpayers liable for the addition to tax for valuation overstatement in all of those cases and liable for the additions to tax for negligence in nearly all of those cases.

## I.  Section 6653(a)(1) and (2) Negligence

Respondent determined that petitioners are liable for additions to tax under section 6653(a)(1) and (2) with respect to the underpayment attributable to petitioners' investment in Dickinson. Petitioners have the burden of proof to show that they are not liable for the additions to tax. See <u>Addington v. Commissioner</u>, <u>supra</u>; <u>Goldman v. Commissioner</u>, 39 F.3d 402, 407 (2d Cir. 1994), affg. T.C. Memo. 1993-480; <u>Luman v. Commissioner</u>,

79 T.C. 846, 860-861 (1982); <u>Bixby v. Commissioner</u>, 58 T.C. 757, 791-792 (1972); see Rule 142(a); <u>INDOPCO, Inc. v. Commissioner</u>, 503 U.S. 79, 84 (1992); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933).[13]

Section 6653(a)(1) and (2) imposes additions to tax if any part of the underpayment of tax is due to negligence or intentional disregard of rules or regulations. Negligence is defined as the failure to exercise the due care that a reasonable and ordinarily prudent person would exercise under the circumstances. See <u>Neely v. Commissioner</u>, 85 T.C. 934, 947 (1985). The pertinent question is whether a particular taxpayer's actions are reasonable in light of the taxpayer's experience, the nature of the investment, and the taxpayer's actions in connection with the transactions. See <u>Henry Schwartz Corp. v. Commissioner</u>, 60 T.C. 728, 740 (1973). In this regard, the determination of negligence is highly factual. "When considering the negligence addition, we evaluate the particular facts of each case, judging the relative sophistication of the taxpayers as well as the manner in which the taxpayers approached their investment." <u>Turner v. Commissioner</u>, T.C. Memo. 1995-363.

Under some circumstances, a taxpayer may avoid liability for

---

[13] Cf. sec. 7491(c), effective for court proceedings arising in connection with examinations commencing after July 22, 1998. In the present cases, the examination of petitioners' income tax returns for 1982 through 1985 commenced well before July 22, 1998.

negligence if reasonable reliance on a competent professional adviser is shown. See United States v. Boyle, 469 U.S. 241, 250-251 (1985); Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991). Reliance on professional advice, standing alone, is not an absolute defense to negligence, but rather a factor to be considered. See Freytag v. Commissioner, supra. For reliance on professional advice to excuse a taxpayer from negligence, the taxpayer must show that the professional had the requisite expertise, as well as knowledge of the pertinent facts, to provide informed advice on the subject matter. See David v. Commissioner, 43 F.3d 788, 789-790 (2d Cir. 1995), affg. T.C. Memo. 1993-621; Goldman v. Commissioner, supra; Freytag v. Commissioner, supra.

Petitioner contends that he reasonably relied on the advice of Gordon. However, Gordon never represented that he had any specialized knowledge about plastics recycling. Morever, the record indicates that Gordon received a 10-percent commission in connection with promoting the Dickinson investment and also provided legal services for which he was compensated. Reliance on representations by insiders or promoters has been held to be an inadequate defense to negligence. See Goldman v. Commissioner, supra; LaVerne v. Commissioner, 94 T.C. 637, 652-653 (1990), affd. without published opinion 956 F.2d 274 (9th

Cir. 1992), affd. without published opinion sub nom. Cowles v. Commissioner, 949 F.2d 401 (10th Cir. 1991). Advice from such individuals "is better classified as sales promotion". Vojticek v. Commissioner, T.C. Memo. 1995-444.

Pleas of reliance have also been rejected when neither the taxpayer nor the advisers purportedly relied on by the taxpayer knew anything about the nontax business aspects of the contemplated venture. See Freytag v. Commissioner, supra; Beck v. Commissioner, 85 T.C. 557 (1985). Thus, petitioner's professed reliance on Gordon's advice was not reasonable. See Patin v. Commissioner, 88 T.C. 1086, 1131 (1987), affd. without published opinion 865 F.2d 1264 (5th Cir. 1989), affd. sub nom. Gomberg v. Commissioner, 868 F.2d 865 (6th Cir. 1989), affd. sub nom. Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), affd. per curiam without published opinion sub nom. Hatheway v. Commissioner, 856 F.2d 186 (4th Cir. 1988); Klieger v. Commissioner, T.C. Memo. 1992-734.

Petitioner claims that he did not know that Gordon was financially interested in Dickinson. Yet in signing the subscription agreement, petitioner assumed that Gordon was the purchaser representative, and the offering memorandum clearly stated that Dickinson would pay "fees of purchaser representatives and selling commissions" from the proceeds of the offering in an amount equal to 10 percent of the aggregate price

of the units.  The offering memorandum also identified Gordon as "Special Counsel to the General Partner" and stated that Dickinson could pay professional fees to Gordon in an amount equal to 5 percent of the aggregate price of the units.

At trial, petitioner admitted that he did not pay Gordon for investment advice, and he described Gordon as "an attorney who put together investment deals of this sort".  Under these circumstances, we are unable to accept uncritically petitioner's assertion that he did not realize that Gordon was being compensated by Dickinson.  At the very least, petitioner should have known that Gordon had a conflict of interest.  See Addington v. Commissioner, 205 F.3d at 59.

Petitioner also contends that he reasonably relied on the advice of Kabeck, his accountant and return preparer.  For reliance on professional advice to excuse a taxpayer from negligence, the taxpayer must show that the professional had the requisite expertise, as well as the knowledge of the pertinent facts, to provide informed advice on the particular subject matter.  See David v. Commissioner, 43 F.3d 788, 789-790 (2d Cir. 1995), affg. per curiam T.C. Memo. 1993-621; Goldman v. Commissioner, supra; Freytag v. Commissioner, supra.  A taxpayer may not reasonably rely on the advice of an accountant who knows nothing about the nontax business aspects of the contemplated venture.  See Freytag v. Commissioner, supra; Beck v.

Commissioner, 85 T.C. 557 (1985).

In the present cases, Kabeck read the offering memorandum. However, Kabeck had no specialized knowledge or experience in plastics materials or plastics recycling and no specialized knowledge in valuing plastics recycling machines such as the Sentinel EPS recycler. In view of Kabeck's lack of knowledge regarding either the nontax or business aspects of the Dickinson investment, petitioner's alleged reliance on his accountant does not relieve petitioner of liability for the additions to tax for negligence. See Addington v. Commissioner, 205 F.3d 54 (2d Cir. 2000).

Petitioner also contends that he reasonably relied on his medical colleagues, particularly Krickstein. However, petitioner did not have any specific conversations with his colleagues about either Dickinson or plastics recycling before making the investment. Indeed, petitioner did not even think that his medical colleagues had any specialized knowledge in plastics recycling or in plastics recycling machines such as the Sentinel EPS recycler.[14] See Addington v. Commissioner, supra. Rather, petitioner merely assumed that Krickstein and other medical colleagues were investing in Dickinson. In short, the perception that his colleagues were investing made petitioner want to

---

[14] It would appear that any knowledge that Krickstein may have had about the Dickinson transactions came from Gordon. See Vojticek v. Commissioner, T.C. Memo. 1995-444.

invest, also.

Petitioners rely on <u>Dyckman v. Commissioner</u>, T.C. Memo. 1999-79, for the proposition that reliance on a trusted friend or adviser (such as Krickstein) relieves a taxpayer from liability for negligence. That case, however, is distinguishable from the present ones.

In <u>Dyckman</u>, we held for the taxpayers on the issue of negligence based on special and unusual circumstances, including the taxpayers' complete lack of sophistication in investment matters and the long-term special relationship of trust and friendship that existed between the taxpayers' and their C.P.A. Also determinative was the fact that the taxpayers did not invest in order to obtain tax benefits; rather, their sole motivation was to provide for their retirement, and they were not even aware that their investment was in a partnership designed to produce tax benefits. Further, the taxpayers were not provided with any literature, such as an offering letter or prospectus, regarding their investment.

In contrast, petitioner is a sophisticated investor and he possessed considerable investment experience at the time that he invested in Dickinson. Moreover, petitioner was aware that his investment in Dickinson offered immediate tax benefits in excess of his investment. Indeed, petitioner was not only influenced to invest in Dickinson in order to obtain the promised tax benefits,

he invested principally for that reason.  Petitioner was also provided with a copy of the offering memorandum but chose not to read it.

In addition, the trusted adviser in the present cases was Nusholtz, the attorney with whom petitioner had a long-standing professional relationship and whose judgment he respected and whose advice he valued.  Although Nusholtz did not read the offering memorandum, he advised petitioner in no uncertain terms not to invest in any promotion offered by Gordon.

For the foregoing reasons, petitioners' reliance on <u>Dyckman v. Commissioner</u>, <u>supra</u>, is misplaced.  Likewise, petitioners' reliance on <u>Zidanich v. Commissioner</u>, T.C. Memo. 1995-382, is misplaced for essentially the same reasons.

Petitioner also contends that he reasonably relied on the offering memorandum and the attachments thereto.  The short answer to this contention is that petitioner did not read all of the offering memorandum.

The record demonstrates that petitioner did not read all of the offering memorandum but only "browsed" through portions, apparently choosing to ignore other portions.  The offering memorandum contained numerous caveats and warnings regarding the business and tax risks of the Dickinson transactions.  A careful review of the offering memorandum, especially the portion discussing the tax risks, would have caused a prudent investor to

question the promised tax benefits.  We would certainly expect no less from a well-educated and sophisticated individual such as petitioner.

At the time that he invested in Dickinson, petitioner did not have any education or work experience in either plastics materials or plastics recycling, nor did petitioner have any specialized knowledge about either the plastics industry in general or the Sentinel EPS recycler in particular. Nevertheless, petitioner did not make any independent investigation of the fair market value of the recycler, nor did he seek the advice of any expert in the plastics industry. Rather, petitioner was content to rely on the offering memorandum.  However, "It is unreasonable for taxpayers to rely on the advice of someone who they should know has a conflict of interest."  Addington v. Commissioner, supra at 59; see Goldman v. Commissioner, 39 F.3d at 406; LaVerne v. Commissioner, 94 T.C. 637, 652-653 (1990), affd. without published opinion 956 F.2d 274 (9th Cir. 1992), affd. in part without published opinion sub nom. Cowles v. Commissioner, 949 F.2d 401 (10th Cir. 1991).

Aside from the cautionary language of the offering memorandum, there were several factors that should have alerted petitioner to the fact that the Sentinel EPS recyclers were overvalued and that independent expert advice was therefore required.  Thus, for example, the exorbitant cost of the

recyclers (i.e., $7,000,000 for four recyclers ) should have made petitioner question their value. Furthermore, as the offering memorandum advised, the Dickinson transactions would be executed simultaneously, in what was essentially nothing other than a circular flow of payments made only through bookkeeping entries.

We are also convinced that petitioner invested in Dickinson principally because the investment offered immediate tax benefits in excess of his $50,000 investment. Thus, the offering memorandum promised an investor who purchased a single partnership unit, tax benefits in 1982 in the form of investment credits in the aggregate amount of $77,000 and tax deductions (i.e., a partnership loss) in the amount of $38,940. On their 1982 return, petitioners actually claimed investment credits in the aggregate amount of $77,001 and a partnership loss in the amount of $39,155. These tax benefits served to reduce petitioners' income tax as reported on their 1982 return by $96,583. Through this reduction in tax petitioners realized a sum approximating 200 percent of their investment in about 4 months.

Finally, mention should be made of two Plastics Recycling cases that were decided after petitioners' briefs were filed; namely, Thompson v. United States, 223 F.3d 1206 (10th Cir. 2000), and Klein v. United States, 94 F. Supp. 2d 838 (E.D. Mich. 2000).

In <u>Thompson v. United States</u>, <u>supra</u>, the Court of Appeals for the Tenth Circuit held that the District Court did not abuse its discretion in instructing the jury that reasonable, good-faith reliance on the advice of a professional adviser constitutes a defense to negligence within the meaning of section 6653. This holding served to uphold the jury's verdict in favor of the taxpayers on the issue of negligence.

In <u>Thompson v. United States</u>, <u>supra</u>, the Government relied heavily on the unpublished opinion of the Court of Appeals for the Tenth Circuit in a similar Plastics Recycling case, <u>Gilmore & Wilson Constr. Co. v. Commissioner</u>, 166 F.3d 1221 (10th Cir. 1999), affg. <u>Estate of Hogard v. Commissioner</u>, T.C. Memo. 1997-174. The Court of Appeals dismissed the Government's assertion that its holding in that case was dispositive of the issue before it:

> In that case we reviewed the tax court's factual determination, made after a bench trial, that the taxpayers were negligent. Here we consider the more limited question of whether a reliance instruction was warranted. Had we been presented with such a question in Gilmore & Wilson, we would likely have upheld the instruction. See id. at *5 ("The evidence introduced, both at trial and through stipulation, presents a close question regarding whether taxpayers were negligent.") For this reason, the government's reliance on Gilmore & Wilson is misplaced. [<u>Thompson v. United States</u>, <u>supra</u> at 1210; fn. ref. omitted.]

In the present cases, we have considered petitioner's contention regarding reliance. However, we have concluded, based on the totality of the facts and circumstances presented at

trial, that petitioners' professed reliance on Gordon, Kabeck, Krickstein, and petitioner's other medical colleagues was not reasonable. Accordingly, we regard <u>Thompson v. Commissioner</u>, <u>supra</u>, as distinguishable from the present cases.

In <u>Klein v. United States</u>, <u>supra</u>, the District Court denied the Government's motion for summary judgment on the issue of the taxpayers' liability for additions to tax for negligence. The District Court held that on the record before it, the issue of negligence could not be decided as a matter of law but rather was an issue to be decided by the trier of fact.

In the present cases, we have addressed the issue of negligence as an issue of fact, which we have decided based on the totality of the facts and circumstances presented at trial. Thus, <u>Klein v. United States</u>, <u>supra</u>, is distinguishable from the present cases.

Upon consideration of the entire record, we hold that petitioners are liable for the additions to tax for negligence under section 6653(a)(1) and (2). Respondent is therefore sustained on this issue.

## II. Section 6621(c) Additional Interest

Section 6621(c), formerly section 6621(d), provides for additional interest in the form of an increased rate of interest (i.e., 120 percent of the normal rate under section 6601) on an underpayment of tax, but only if such underpayment exceeds $1,000

and is attributable to a tax-motivated transaction.  The increased rate of interest is effective with respect to interest accruing after December 31, 1984, even though the transaction was entered into before that date.  See Solowiejczyk v. Commissioner, 85 T.C. 552 (1985), affd. without published opinion 795 F.2d 1005 (2d Cir. 1986).  Section 6621(c) was repealed by section 7721(b) of the Omnibus Budget Reconciliation Act of 1989, Pub. L. 101-239, 103 Stat. 2399, effective with respect to returns the due date for which is after December 31, 1989.

As indicated, additional interest applies only if an underpayment of tax is attributable to a tax-motivated transaction.  The term "tax-motivated transaction" is defined in section 6621(c)(3) to include any valuation overstatement within the meaning of section 6659(c), see sec. 6621(c)(3)(A)(i), or any sham or fraudulent transaction, sec. 6621(c)(3)(A)(v).

There is no dispute in these cases that petitioners' underpayment of tax for 1982 is attributable to tax-motivated transactions within the meaning of section 6621(c)(3)(A).  Likewise, there is no dispute that petitioners paid the additional interest under section 6621 that was assessed by respondent and that petitioners have the opportunity in the present cases to contest their liability for such interest pursuant to the Court's overpayment jurisdiction.  See sec. 6512(b); Barton v. Commissioner, 97 T.C. 548 (1991).  It is in

this context that petitioners contend that they are not liable for additional interest because assessment of additional interest under section 6621(c) without prior opportunity to contest such assessment violates the Due Process Clause of the Fifth Amendment.

In order to address petitioners' contention, we need to step back and briefly review the unified audit and litigation procedures that apply to TEFRA partnerships (the TEFRA procedures).

In general, the tax treatment of any partnership item is determined at the partnership level pursuant to the TEFRA procedures. The TEFRA procedures apply with respect to a partnership's taxable years beginning after September 3, 1982. See Sparks v. Commissioner, 87 T.C. 1279, 1284 (1986); Maxwell v. Commissioner, 87 T.C. 783, 789 (1986). Partnership items include the partnership aggregate and each partner's share of (1) items of income, gain, loss, deduction, or credit of the partnership and (2) other amounts determinable at the partnership level with respect to partnership assets, investments, transactions and operations necessary to enable the partnership or the partners to determine the allowable investment credit. See sec. 6231(a)(3); sec. 301.6231(a)(3)-1(a)(1)(i), (vi)(A), Proced. & Admin. Regs.

An affected item is defined in section 6231(a)(5) as any item to the extent such item is affected by a partnership item.

See White v. Commissioner, 95 T.C. 209, 211 (1990).  The first type of affected item is a computational adjustment made to record the change in a partner's tax liability resulting from the proper treatment of a partnership item.  Sec. 6231(a)(6); White v. Commissioner, supra.  Once partnership level proceedings are completed, respondent is permitted to assess a computational adjustment against a partner without issuing a notice of deficiency.  Sec. 6230(a)(1); N.C.F. Energy Partners v. Commissioner, 89 T.C. 741, 744 (1987); Maxwell v. Commissioner, supra at 792 n.9.[15]

The second type of affected item is one that is dependent on factual determinations to be made at the individual partner level.  See N.C.F. Energy Partners v. Commissioner, supra at 744.  Section 6230(a)(2)(A)(i) provides that the normal deficiency procedures apply to those affected items which require partner level determinations.  Additions to tax for negligence and for valuation overstatement are affected items requiring factual determinations at the individual partner level.  See N.C.F. Energy Partners v. Commissioner, supra at 744-745.

Additional interest under section 6621 is an affected item

---

[15]  See also sec. 301.6231(a)(6)-1T(b), Temporary Proced. & Admin. Regs., 52 Fed. Reg. 6791 (Mar. 5, 1987), which provides that "A computational adjustment includes any interest due with respect to any underpayment or overpayment of tax attributable to adjustments to reflect properly the treatment of partnership items."

because the determination of a taxpayer's liability for such interest may require findings of fact peculiar to the particular taxpayer, namely, the amount of the taxpayer's underpayment that is attributable to a tax-motivated transaction. See N.C.F. Energy Partners v. Commissioner, supra at 745-746. Because the application of section 6621(c) turns on matters that are specific to individual partners, it follows that such interest constitutes an affected item that cannot be reviewed in a partnership level proceeding. See Affiliated Equipment Leasing II v. Commissioner, 97 T.C. 575, 577-578 (1991); N.C.F. Energy Partners v. Commissioner, supra at 745-746.

Ironically, however, a specific partner's liability for additional interest under section 6621(c) normally cannot be raised in an affected items proceeding. This rule, first articulated in White v. Commissioner, supra, follows from a combined reading of sections 6211(a), 6230(a), and 6601(e)(1), which together provide that interest computed under the increased rate under section 6621(c) is not a "deficiency" within the meaning of section 6211. Because our authority in affected items proceedings derives from our jurisdiction to redetermine a deficiency under subchapter B of chapter 63, see sec. 6230(a)(2), we generally have no authority to consider additional interest under section 6621 in affected items proceedings. See Odend'hal v. Commissioner, 95 T.C. 617 (1990). A narrow exception to this

rule applies if a taxpayer pays the additional interest and invokes our overpayment jurisdiction.  See sec. 6512(b); <u>Barton v. Commissioner</u>, 97 T.C. 548 (1991).

From the foregoing, it is apparent that, for taxable years governed by the TEFRA partnership procedures, taxpayers do not have a prepayment forum within which to contest their liability for additional interest under section 6621 where such interest has accrued on a tax deficiency assessed as a computational adjustment following a partnership level proceeding.[16]  See <u>Affiliated Equipment Leasing II v. Commissioner</u>, <u>supra</u> at 579. It is this lack of a prepayment forum that petitioners view as violative of the Due Process Clause of the Fifth Amendment.

We begin by observing that once we decide that there is a tax-motivated transaction such as a valuation overstatement or a sham or fraudulent transaction, the determination of additional interest is largely mechanical.  See <u>Copeland v. Commissioner</u>, T.C. Memo. 2000-181; see also <u>Thomas v. United States</u>, 166 F.3d 825, 834 (6th Cir. 1999), holding that if a transaction is tax-motivated within the meaning of section 6621(c), the individual taxpayer-investor's motive is irrelevant.

---

[16]  By contrast, where a tax deficiency falls within our deficiency jurisdiction, taxpayers may contest their liability for additional interest under sec. 6621 before this Court in the context of a deficiency action without first paying the interest. See e.g., sec. 6621(c)(4); <u>Carroll v. Commissioner</u>, T.C. Memo. 2000-184, finding the taxpayers liable for additional interest for the taxable year 1981.

We think petitioners' contention has been essentially answered by the Court of Appeals for the Sixth Circuit, the circuit to which these cases are appealable, see sec. 7482(b)(1)(A), in Johnston v. Commissioner, 429 F.2d 804 (6th Cir. 1970), affg. 52 T.C. 792 (1969). In that case, the taxpayer filed a petition with this Court contesting the assessment, without the prior issuance of a notice of deficiency, of an addition to tax under section 6654(a) for failure to pay estimated tax. We granted the Commissioner's motion to dismiss for lack of jurisdiction, holding that section 6659(b)[17] did not require the issuance of a notice of deficiency for the particular addition involved. In so holding, we stated:

> We are not aware of any case that holds that the assessment of a tax before the taxpayer is given his day in Court is a denial of due process. To the contrary, see Phillips v. Commissioner, 283 U.S. 589 (1931). Prior to the establishment of the Board of Tax Appeals (now the Tax Court) prepayment of the tax was a prerequisite to the right to test in court all taxes determined to be due by the Commissioner of Internal Revenue. [Johnston v. Commissioner, 52 T.C. at 793.]

In affirming our action, the Court of Appeals acknowledged that "the payment of taxes as a precondition to sue for their return places a burden on the taxpayer". Id. at 806. However, the Court of Appeals went on to hold that given the availability of a refund action, such burden "does not so deprive him of an

_____

[17] Sec. 6659 has been renumbered several times. In the current Internal Revenue Code, it appears as sec. 6665.

effective determination and adjudication of his final tax liability as to violate his Fifth Amendment rights to 'fundamental due process.'" Id.

Similarly, in Fendler v. Commissioner, 441 F.2d 1101 (9th Cir. 1971), the Court of Appeals for the Ninth Circuit held that there was no denial of due process in requiring a taxpayer first to pay certain additions to tax and then to seek review of his liability in a refund proceeding.

Further, it is well settled that

> The right of the United States to collect its internal revenue by summary administrative proceedings has long been settled. Where, as here, adequate opportunity is afforded for a later judicial determination of the legal rights, summary proceedings to secure prompt performance of pecuniary obligations to the government have been consistently sustained. [Phillips v. Commissioner, 283 U.S. 589, 595 (1931); fn. ref. omitted.]

and that

> the right of the United States to exact immediate payment and to relegate the taxpayer to a suit for recovery is paramount. [Id. at 599.]

In view of the foregoing, we reject petitioners' contention, and we hold that there is no overpayment in petitioners' income tax for 1982 insofar as additional interest under section 6621(c) is concerned. See sec. 6601(e)(1).

III. Conclusion

Petitioners have made other arguments that we have considered in reaching our decision. To the extent that we have

not discussed those arguments, we find them to be without merit.

To reflect our disposition of the disputed issues, as well as petitioners' concessions, see <u>supra</u> note 2,

<u>Decisions will be entered for respondent</u>.