T.C. Memo. 2000-389

UNITED STATES TAX COURT

KEITH E. AND MARILYN B. WEST, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

WARREN S. AND ELIZABETH A. WEST, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 3076-95, 15324-95. Filed December 22, 2000.

<u>Terrance A. Costello</u>, for petitioners.

<u>David L. Zoss</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

DAWSON, <u>Judge</u>: These consolidated cases were assigned to
Special Trial Judge Norman H. Wolfe pursuant to the provisions of
section 7443A(b)(4) in effect when these proceedings commenced,
and Rules 180, 181, and 183. All section references are to the
Internal Revenue Code, and all Rule references are to the Tax

Court Rules of Practice and Procedure.  The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below.

OPINION OF THE SPECIAL TRIAL JUDGE

WOLFE, Special Trial Judge:  In so-called affected items notices of deficiency, respondent determined additions to tax with respect to petitioners' Federal income taxes for the years and in the amounts as shown below:

Keith E. & Marilyn B. West

| | Additions to Tax | | |
|---|---|---|---|
| Year | Sec. 6653(a)(1) | Sec. 6653(a)(2) | Sec. 6659 |
| 1979 | $808 | -0- | $4,848 |
| 1982 | 1,607 | [1] | 8,467 |
| 1983 | 25 | [1] | -0- |
| 1984 | 10 | [1] | -0- |

Warren S. & Elizabeth A. West

| | Additions to Tax | | |
|---|---|---|---|
| Year | Sec. 6653(a)(1) | Sec. 6653(a)(2) | Sec. 6659 |
| 1979 | $953 | -0- | $5,717 |
| 1980 | 204 | -0- | 1,191 |
| 1982 | 1,239 | [1] | 4,787 |

[1]   Fifty percent of the interest payable with respect to the portion of the underpayment that is attributable to negligence. The underpayments were determined and assessed pursuant to a partnership-level proceeding.  See secs. 6231-6233.  With regard to petitioners Keith E. and Marilyn B. West, respondent determined underpayments attributable to negligence of $32,147, $498, and $207 for 1982, 1983, and 1984, respectively.  With regard to petitioners Warren S. and Elizabeth A. West, respondent determined an underpayment attributable to negligence for 1982 of $24,772.

The issues for decisions[1] are: (1) Whether petitioners are liable for additions to tax under section 6653(a)(1) and (2) for negligence or intentional disregard of rules or regulations, and (2) whether petitioners are liable for additions to tax under section 6659 for underpayments of tax attributable to valuation overstatements.

FINDINGS OF FACT

Some of the facts have been stipulated, and they are so found. The stipulated facts and attached exhibits are incorporated herein by this reference. Petitioners Keith E. and Marilyn B. West resided in Edina, Minnesota, at the time they filed the petition in this case. Petitioners Warren S. and Elizabeth A. West resided in Burnsville, Minnesota, at the time they filed the petition in this case.

---

[1] It would appear that petitioners have abandoned any contention regarding the statute of limitations (the so-called Davenport issue) in view of the affirmance of this Court's opinion on that issue by the Court of Appeals for the Eleventh Circuit. See Davenport Recycling Associates v. Commissioner, 220 F.3d 1255 (11th Cir. 2000), affg. T.C. Memo. 1998-347; see also Klein v. United States, 86 F. Supp. 2d 690 (E.D. Mich. 1999); Clark v. United States, 68 F. Supp. 2d 1333, 1342-1346 (N.D. Ga. 1999); Barlow v. Commissioner, T.C. Memo. 2000-339; Kohn v. Commissioner, T.C. Memo. 1999-150. However, if we are mistaken in this regard, then we refer the parties to paragraphs 61-63 of the supplemental stipulation of facts, and we decide the Davenport issue in respondent's favor based on the foregoing precedent.

A.  The Masters Transactions

These consolidated cases are part of the Plastics Recycling group of cases.  The additions to tax arise from the disallowance of losses, investment credits, and energy credits claimed by petitioners with respect to a partnership called Masters Recycling Associates (Masters or the partnership).

For a detailed discussion of the transactions involved in the Plastics Recycling cases, see Provizer v. Commissioner, T.C. Memo. 1992-177, affd. without published opinion 996 F.2d 1216 (6th Cir. 1993).  The underlying transactions involving the Sentinel recycling machines (recyclers) in these cases are substantially identical to the transactions in Provizer v. Commissioner, supra, and, with the exception of certain facts that we regard as having minimal significance, petitioners have stipulated substantially the same facts concerning the underlying transactions that were described in Provizer v. Commissioner, supra.

In a series of simultaneous transactions closely resembling those in Provizer, that for convenience are referred to herein as the Masters transactions, Packaging Industries Group (PI) of

Hyannis, Massachusetts, manufactured and sold[2] four Sentinel EPS[3] recyclers to Ethynol Cogeneration, Inc. (ECI) for $1,520,000 each. The sale of the recyclers from PI to ECI was partially financed with nonrecourse promissory notes. For each recycler, ECI agreed to pay PI $112,750 in cash, with the remaining balance of $1,407,250 financed through a 12-year nonrecourse promissory note.

Simultaneously, ECI resold the recyclers to F & G Equipment Corp. (F&G) for $1,750,000 per machine. For each machine, F&G agreed to pay ECI $128,250 in cash, with the remaining balance of $1,621,750 financed through a purportedly partial recourse promissory note. The note was recourse to the extent of 20 percent of its face value. However, the recourse portion was payable only after the nonrecourse portion was satisfied.

---

[2]     Terms such as sale and lease, as well as their derivatives, are used for convenience only and do not imply that the particular transaction was a sale or lease for Federal tax purposes. Similarly, terms such as joint venture and agreement are also used for convenience only and do not imply that the particular arrangement was a joint venture or an agreement for Federal tax purposes.

[3]     EPS stands for expanded polystyrene. The case of Provizer v. Commissioner, T.C. Memo. 1992-177, affd. per curiam without published opinion 996 F.2d 1216 (6th Cir. 1993), involved Sentinel expanded polyethylene (EPE) recyclers. However, the EPS recycler partnerships and the EPE recycler partnerships are essentially identical. See Davenport Recycling Associates v. Commissioner, T.C. Memo. 1998-347, affd. 220 F.3d 1255 (11th Cir. 2000); see also Ulanoff v. Commissioner, T.C. Memo. 1999-170 (same); Gottsegen v. Commissioner, T.C. Memo. 1997-314 (involving both the EPE and EPS recyclers).

In turn, F&G leased the recyclers to Masters. Pursuant to the lease and in accordance with applicable provisions of the Internal Revenue Code and Treasury regulations, F&G elected to treat Masters as having purchased the recyclers for purposes of the investment and business energy tax credits.

Simultaneously, Masters entered into a joint venture with PI and Resin Recyclers, Inc. (RRI). The joint venture agreement provided that RRI was to assist Masters with the placement of recyclers with end-users. At the same time, PI, ECI, F&G, Masters, and RRI entered into arrangements that provided that PI would pay a monthly joint venture fee to Masters, in the same amount that Masters would pay as monthly rent to F&G, in the same amount as F&G would pay monthly on its note to ECI, in the same amount that ECI would pay each month on its note to PI. In connection with these arrangements, PI, ECI, F&G, Masters, and RRI entered into offsetting agreements so that these monthly payments were kept only as bookkeeping entries and no money actually was transferred. Consequently, all of the monthly payments required among the entities in the above transactions offset each other, and the transactions occurred simultaneously.

On its 1982 tax return Masters reported that the four recyclers had an aggregate basis of $7,000,000, or $1,750,000 each, for purposes of the investment and business energy tax credits. In the present cases, the parties stipulated that in

1982 the recyclers were not properly valued at $1,750,000 each, but instead had only a maximum value of $30,000 to $50,000 each. On its 1982, 1983, 1984, and 1985 tax returns, Masters reported net ordinary losses of $713,291, $36,205, $16,720, and $15,832, respectively. Losses and credits were reported by Masters on its tax returns, and the portions attributable to petitioners, respectively, were included on Forms K-1 issued to them and filed with Masters' tax returns.

B. The Private Offering Memorandum

Generally, Masters distributed a private offering memorandum to potential investors. The offering memorandum informed investors that Masters' business would be conducted in accordance with the transaction described above. The offering memorandum also warned potential investors of significant business and tax risks associated with investing in Masters.

Specifically, the offering memorandum warned potential investors that: (1) There was a substantial likelihood of an audit by the Internal Revenue Service (IRS); (2) "On audit, the purchase price of the Sentinel EPS recyclers to be paid by F&G to ECI may be challenged by the * * * [IRS] as being in excess of the fair market value thereof, a practice followed by * * * [the IRS] in transactions it deems to be tax shelters"; (3) the partnership had no prior operating history; (4) the limited partners would have no control over the conduct of the

partnership's business; (5) there was no established market for the Sentinel EPS recyclers; (6) there were no assurances that market prices for virgin resin would remain at then current prices per pound or that the recycled pellets would be as marketable as virgin pellets; and (7) certain potential conflicts of interest existed.

The offering memorandum contained a marketing opinion by Stanley Ulanoff (Ulanoff) and a technical opinion by Samuel Burstein (Burstein). Ulanoff owned a 4.37-percent interest in Taylor Recycling Associates, which purported to lease four plastic recyclers, and Burstein owned a 5.82-percent interest in Jefferson Recycling Associates, which also purported to lease four plastic recyclers. The offering memorandum disclosed that Burstein was a client of PI's corporate counsel. The offering memorandum also warned potential investors not to rely on the statements and opinions contained in the memorandum, but to conduct an independent investigation.

The private offering memorandum also projected that in the initial year of investment an investor contributing $50,000 would receive investment tax credits and business energy credits of $77,000 and tax deductions of $38,940. The private offering memorandum provided that an investor in Masters was required to have an individual net worth and/or net worth with a spouse of

$1,000,000, inclusive of residences and personal property, or income of $200,000 per year for each unit of investment.

## C. Partnership-Level Litigation

On June 5, 1989, respondent issued Notices of Final Partnership Administrative Adjustment (FPAA) to Masters' tax matters partner (TMP) for 1982, 1983, 1984, and 1985. Subsequently, on June 19, 1989, copies of the FPAA's for 1982, 1983, and 1984 were sent to Keith and Marilyn West. On the same date, a copy of the FPAA for 1982 was sent to Warren and Elizabeth West. In the FPAA's, respondent disallowed the losses that Masters had reported on its 1982, 1983, 1984, and 1985 Federal income tax returns and determined that Masters did not incur "a loss in a trade or business or in an activity entered into for profit or with respect to property held for the production of income." Respondent also determined that Masters' basis in the recycling equipment was zero, rather than $7,000,000, for purposes of the investment tax and business energy credits.

Subsequently, a petition was filed by Masters' tax matters partner. On February 23, 1994, the Court entered a decision in Masters Recycling Associates, Sam Winer, Tax Matters Partner v. Commissioner, docket No. 18417-89. This decision reflects a full concession by Masters of all items of income, loss, and the underlying equipment valuation used for tax credit purposes.

D.  Keith and Marilyn West

In 1956, Keith West (Keith) graduated from the University of Minnesota with a bachelor of science degree.  After graduation, Keith was employed in the engineering department of Benson Optical Co. (Benson).  Subsequently, Keith was promoted by Benson to vice president of operations, then executive vice president, and then ultimately president.  Keith was the president of Benson from 1977 to 1985.  Benson had 1,600 employees and had offices and laboratories in 23 States.  Eight or nine vice presidents reported directly to Keith, as president.  In 1969, Benson was acquired by a publicly held company, Frigitronics.  At one time, Keith also served on Frigitronics' board of directors.

Prior to 1982, Keith had only made a small number of investments.  He had accumulated Benson Optical stock, and he had Frigitronics stock after the acquisition.  Also, he had made a limited partnership investment in fourplexes in Minneapolis, at the suggestion of a friend and neighbor who was a partner in the selling company.  In 1982, Keith was 51 years old and was interested in planning for his future retirement.  Upon the recommendation of a friend, Keith contacted a Cigna representative named Ernest Mejia (Mejia).  Keith had some familiarity with Cigna because he understood that Cigna was a division of Connecticut General Life Insurance Co. (Connecticut General).  One of the alternative investments offered to

employees by Benson's profit-sharing trust, of which Keith was a trustee, was a fund sponsored by Connecticut General.

Sometime during 1982, Keith met with Mejia to review his income and retirement goals. During this meeting, Mejia recommended investing in Hamilton Recycling Associates (Hamilton). Keith contends that he was impressed by Hamilton because Hamilton offered solutions to the United States' energy shortage and waste disposal problems. Keith also noted that Benson received and used products for packaging similar to the so-called peanuts produced by the recyclers. Keith further asserts that Mejia represented that Hamilton was a Cigna-researched investment. Keith did not review any Cigna materials promoting Hamilton, nor did he make any independent inquiries as to whether Hamilton was a Cigna-researched investment.

Keith contends that Mejia told him that he had traveled to New York and met with Hamilton's accountants. Keith also contends that Mejia told him that he had traveled to a site where a recycler was being used and had brought back some of the peanuts the machine produced. Mejia did not testify at the trial.

Keith received a copy of Hamilton's offering memorandum and spent 3 or 4 hours reviewing it. In reviewing the memorandum, Keith noted and relied upon Ulanoff's marketing report and Burstein's technical opinion, even though he was aware that the

memorandum specifically warned potential investors not to rely on the reports contained in it.

Subsequently, Keith and Mejia spoke with Gerald Grande (Grande), a certified public accountant (C.P.A.) who had previously given tax advice to Keith and had prepared Keith's income tax returns. Pursuant to this conversation, Grande had one of his firm's staff members review the offering memorandum. Based upon the staff person's review, Grande concluded that the Hamilton transaction met the criteria for the energy tax credit and that the offering memorandum was properly prepared. However, Grande did not review Hamilton's nontax business aspects. At trial, Keith testified as follows: "Mr. Grande was not asked, nor did he give an opinion on the investment. He was only asked to review the document to see if it met the criteria for the energy tax credit." Neither Grande nor the staff person who reviewed the offering memorandum had any experience or education with plastics or plastics recycling. Moreover, Grande did not contact any expert in the plastics or plastics recycling field as part of his review. Grande also testified that he probably referred to Hamilton as a tax shelter during his discussions with Keith and Mejia.

Keith does not have any education or experience with the plastics or plastics recycling industries. Keith also did not consult with anyone who had any expertise with plastics or

plastics recycling. However, Keith contends that he decided to invest in Hamilton based upon Mejia's and Grande's advice.

Ultimately, Keith was unable to invest in Hamilton because partnership interests in Hamilton were no longer available by the time he decided to invest. Then Mejia told Keith that interests in Masters, another recycling limited partnership identical to Hamilton, were available. Keith received the Masters offering memorandum, but he did not thoroughly review the Masters offering memorandum because it was duplicative of the Hamilton offering memorandum.

For 1979, 1982, 1983, and 1984, Keith and Marilyn West filed joint Federal income tax returns. In 1982, Keith invested $25,000 in Masters. As a result of his investment in Masters, Keith claimed net operating loss deductions of $19,616, $995, and $460 on his 1982, 1983, and 1984 Federal income tax returns, respectively. On his 1982 Federal income tax return, Keith also claimed investment tax and business energy credits totaling $38,500, which was limited by his 1982 income tax liability (as reduced by the partnership loss) and the alternative minimum tax. On April 20, 1983, Keith filed an application for tentative refund, Form 1045, carrying back investment and business energy tax credits to 1979 to generate a tax refund of $16,161.

Keith did not actively monitor his investment in Masters. At trial, Keith testified: "[T]here wasn't a lot you could do to

monitor.  We certainly got the mail from the Internal Revenue Service as well as from the partnership.  And that's about all we could monitor."  Keith also acknowledged that he did not undertake any independent investigation regarding the value of the recyclers and that he was fully aware of the tax benefits associated with investing in Masters.

E.  Warren and Elizabeth West

In 1955, Warren West (Warren) received a bachelor of science degree in civil engineering from the University of Minnesota.  After graduation, Warren was employed by the Center City Co. (Center City).  Eventually, Warren became the president of Center City.  At times, Warren also sat on the boards of three publicly held companies.

Prior to 1982, Warren invested mostly in shares of publicly traded companies.  Sometime during 1982, Warren learned about Hamilton from Mejia, an agent for Cigna who was working with Warren with regard to his financial and estate planning.  Warren asserts that Mejia told him that he had traveled east and had seen the recycling equipment and that Hamilton was a viable ongoing operation.  As result of his discussions with Mejia, Warren spent an unspecified number of hours reviewing the Hamilton offering memorandum.  Warren also asserts that he asked his C.P.A., Jim Maki (Maki), to review the Hamilton offering memorandum.  Warren claims that Maki told him that the Hamilton

transaction satisfied certain tax regulations concerning the organization's qualification as a limited partnership so that it could pass through tax benefits to limited partners. Warren concedes that his conversations with Maki were limited to tax issues surrounding Hamilton and not Hamilton's economic or financial aspects. Maki did not testify during the trial.

Warren did not invest in Hamilton because partnership interests were no longer available when he reached his decision to invest. Then Mejia told Warren that partnership interests in Masters, another recycling partnership substantially identical to Hamilton, were available. Accordingly, Warren received the Masters offering memorandum. Warren did not review the Masters offering memorandum because it was substantially identical to the Hamilton offering memorandum. Warren did not undertake any independent investigation concerning Masters' economic or financial aspects. At trial, Warren testified that "the only thing I had to go on was in the prospectus. And it looked fairly good." Warren further testified as to why the Masters prospectus looked good to him. "Two reasons: One is the relatively generous tax benefit up front, and that in the long-run, it was supposed to turn a profit." Warren further testified that he did "very little" to monitor his investment in Masters. Warren also acknowledged that Mejia marketed Masters as a tax shelter.

Warren does not have any experience or education in plastics or plastics recycling. He did not consult with any experts in the plastics or plastics recycling industries.

For 1979, 1980, and 1982, Warren and Elizabeth West filed joint Federal income tax returns. In 1982, Warren invested $25,000 in Masters. As a result of his investment in Masters, Warren claimed a net operating loss deduction of $19,615 on his 1982 Federal income tax return. On his 1982 Federal income tax return, Warren also claimed investment tax and business energy tax credits totaling $38,502, which was limited to his 1982 income tax liability (as reduced by the partnership loss) and the alternative minimum tax. On April 18, 1983, Warren filed an application for tentative refund, Form 1045, carrying back investment and business energy tax credits to 1979 and 1980 to generate tax refunds of $19,057, and $3,970, respectively.

OPINION

We have decided many Plastics Recycling cases. Most of these cases, like the present cases, raised issues regarding additions to tax for negligence and valuation overstatement. See, e.g., Barber v. Commissioner, T.C. Memo. 2000-372; Carroll v. Commissioner, T.C. Memo. 2000-184; Ulanoff v. Commissioner, T.C. Memo. 1999-170; Greene v. Commissioner, T.C. Memo. 1997-296; Kaliban v. Commissioner, T.C. Memo. 1997-271; Sann v. Commissioner, T.C. Memo. 1997-259 n.13 (and cases cited therein),

affd. sub nom. <u>Addington v. Commissioner</u>, 205 F.3d 54 (2d Cir. 2000). In all but a few of those cases, we found the taxpayers liable for the additions to tax for negligence. Moreover, in all of the Plastics Recycling cases in which the issue has been raised, we have found the taxpayers liable for additions to tax for valuation overstatement.

In <u>Provizer v. Commissioner</u>, T.C. Memo. 1992-177, the test case for the Plastics Recycling group of cases, this Court: (1) Found that each recycler had a fair market value of not more than $50,000; (2) held that the transaction, which was virtually identical to the transactions in the present cases, was a sham because it lacked economic substance and a business purpose; (3) sustained the additions to tax for negligence under section 6653(a)(1) and (2); (4) sustained the addition to tax for valuation overstatement under section 6659 because the underpayment of taxes was directly related to the overvaluation of the recyclers; and (5) held that the partnership losses and tax credits claimed with respect to the plastics recycling partnership at issue were attributable to tax-motivated transactions within the meaning of section 6621(c). We also found that other recyclers were commercially available during the years in issue. See <u>id.</u> In reaching the conclusion that the transaction lacked a business purpose, this Court relied heavily upon the overvaluation of the recyclers. Similarly, in <u>Gottsegen</u>

v. Commissioner, T.C. Memo. 1997-314, we found that each Sentinel EPS recycler had a fair market value not in excess of $50,000, and relied heavily on the overvaluation of the recyclers in concluding that the taxpayer was negligent and liable for accuracy-related penalties.

## A.  Section 6653(a)(1) and (2) Negligence

In these cases, respondent determined that petitioners were liable for additions to tax for negligence under section 6653(a)(1) and (2) with respect to underpayments attributable to petitioners' investment in Masters.  In each case, petitioners contend that they were not negligent because:  (1) They reasonably relied in good faith upon the advice of advisers, including a competent and experienced accountant, in deciding to invest in Masters, and (2) they intended to make a profit from their investment in Masters.

Section 6653(a)(1) and (2) imposes additions to tax if any part of the underpayment of tax is due to negligence or intentional disregard of rules or regulations.  Negligence is defined as the failure to exercise the due care that a reasonable and ordinarily prudent person would exercise under the circumstances.  See Neely v. Commissioner, 85 T.C. 934, 947 (1985).  The pertinent question is whether a particular taxpayer's actions are reasonable in light of the taxpayer's experience, the nature of the investment, and the taxpayer's

actions in connection with the transactions.  See Henry Schwartz Corp. v. Commissioner, 60 T.C. 728, 740 (1973).  When considering the negligence additions to tax, we evaluate the particular facts of each case, judging the relative sophistication of the taxpayers, as well as the manner in which they approached their investment.  See McPike v. Commissioner, T.C. Memo. 1996-46.

1.  Petitioners' Purported Reliance on an Adviser

In these cases, petitioners claim that they reasonably relied upon the advice of a qualified tax adviser.  A taxpayer may avoid liability for the additions to tax under section 6653(a)(1) and (2) if he or she reasonably relied on competent professional advice.  See United States v. Boyle, 469 U.S. 241, 250-251 (1985); Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991).  See also American Properties, Inc. v. Commissioner, 28 T.C. 1100, 1116-1117 (1957), affd. per curiam 262 F.2d 150 (9th Cir. 1958).  Reliance on professional advice, standing alone, is not an absolute defense to negligence, but rather a factor to be considered.  See Freytag v. Commissioner, supra.  For reliance on professional advice to excuse a taxpayer from the negligence additions to tax, the taxpayer must show that the professional had the expertise and knowledge of the pertinent facts to provide informed advice on the subject matter.  See Chakales v. Commissioner, 79 F.3d 726 (8th Cir. 1996), affg. T.C. Memo. 1994-

408; David v. Commissioner, 43 F.3d 788, 789-790 (2d Cir. 1995), affg. T.C. Memo. 1993-621; Freytag v. Commissioner, supra; Sann v. Commissioner, T.C. Memo. 1997-259.

Moreover, reliance on representations by insiders or promoters, or on offering materials has been held an inadequate defense to negligence. See Pasternak v. Commissioner, 990 F.2d 893 (6th Cir. 1993), affg. Donahue v. Commissioner, T.C. Memo. 1991-181; LaVerne v. Commissioner, 94 T.C. 637, 652-653 (1990), affd. without published opinion 956 F.2d 274 (9th Cir. 1992); Sann v. Commissioner, supra. Pleas of reliance have been rejected when neither the taxpayer nor the advisers purportedly relied upon by the taxpayer knew anything about the nontax business aspects of the contemplated venture. See David v. Commissioner, supra; Freytag v. Commissioner, supra.

In these cases, petitioners' purported reliance on Grande and Maki does not relieve them of liability for the additions to tax for negligence. Grande's and Maki's expertise was in taxation, not plastics or plastics recycling. Moreover, neither Grande nor Maki consulted with any persons who had such expertise in plastics or plastics recycling. At trial, Keith and Warren testified that Grande's and Maki's review was limited to examining the offering memorandum to ascertain whether the documents had been properly prepared so that they as limited partners would be entitled to the tax benefits presented by the

offering memorandum. In effect, the advice provided by Grande and Maki did not suggest anything beyond the view that, if the facts and circumstances proved to be as represented by Mejia and in the offering memorandum, then the tax benefits described in the offering memorandum should be allowed. Keith and Warren did not rely upon Grande or Maki with regard to Masters' nontax business aspects.

Accordingly, petitioners, Grande, and Maki solely relied upon the offering materials and Mejia's representations with regard to the recyclers' value and Masters' economic viability. The offering memorandum contained reports by Ulanoff and Burstein. Petitioners, Grande, and Maki never investigated whether Ulanoff or Burstein had an interest in plastics recycling transactions. In fact, Ulanoff and Burstein each invested in plastics recycling partnerships. The offering memorandum also disclosed that Burstein was a client and business associate of PI's corporate counsel. Moreover, the offering memorandum specifically warned potential investors not to rely on the statements or opinions contained in it. Lastly, as a broker, Mejia clearly had a financial interest in selling the partnership interests to petitioners. In this transaction, Mejia was engaged in a selling function rather than an advisory function, and petitioners, as experienced businessmen and educated persons,

knew or should have known to exercise caution in relying upon the seller's representative for advice as to whether they should buy.

On this record, we hold that it was not reasonable for petitioners to claim substantial tax credits and partnership losses on the basis of Mejia's, Grande's, or Maki's advice. Neither Grande nor Maki had the requisite expertise or knowledge of the pertinent facts to provide informed advice regarding the claimed partnership losses and tax credits. A taxpayer may rely upon his adviser's expertise, but it is not reasonable or prudent to rely upon an adviser regarding matters outside of his field of expertise or with respect to facts that he does not verify. See David v. Commissioner, supra at 789-790; Goldman v. Commissioner, 39 F.3d 402, 408 (2d Cir. 1994); Freytag v. Commissioner, 89 T.C. 849 (1991); Sann v. Commissioner, supra. Moreover, as indicated above, in these cases there is no credible evidence that either of them offered advice beyond his limited area of knowledge relating to the technical tax aspects of the transaction. Petitioners' purported reliance on Mejia's advice was also unreasonable. We have consistently held that advice from such persons is better classified as sales promotion. See Singer v. Commissioner, T.C. Memo. 1997-325; Sann v. Commissioner, supra; Vojticek v. Commissioner, T.C. Memo. 1995-444. We note that in these cases, Mejia did not testify, and that circumstance suggests that if he had testified, that testimony would have been

unfavorable to petitioners.  See <u>Wichita Terminal Elevator Co. v. Commissioner</u>, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947).

2.  <u>Petitioners' Purported Profit Motive</u>

In these cases, petitioners also contend that they were not negligent because they invested in Masters for economic profits and as a source of income for retirement.  Keith and Warren each had an extensive business background and had enjoyed a successful career in his respective field.  Moreover, Keith and Warren each had been the head of a large company and each had experience with complex financial decisions.  Keith and Warren read Hamilton's offering memorandum, which was substantially identical to Masters' offering memorandum.  The offering memorandum specifically warned potential investors of significant business and tax risks associated with investing in these types of partnerships.  The offering memorandum also warned potential investors that the value of the recyclers might be challenged by the IRS, a practice often followed by the IRS in transactions it deems to be tax shelters.  Nevertheless, petitioners disregarded these warnings and failed to consult any independent advisers with expertise in plastics or plastics recycling.  Petitioners also failed to conduct a reasonable independent investigation into the market value of the recyclers or any of the other economics of the Masters' transaction.  Moreover, Grande

testified that he probably referred to Hamilton as a tax shelter. Warren also testified that he knew that Masters was a tax shelter.

Petitioners' reliance on Krause v. Commissioner, 99 T.C. 132 (1992), affd. sub nom. Hildebrand v. Commissioner, 28 F.3d 1024 (10th Cir. 1994), is misplaced. The facts in Krause are distinguishable from the facts in these cases. In Krause, the taxpayers invested in limited partnerships whose investment objectives concerned enhanced oil recovery (EOR) technology. The Krause opinion states that during the late 1970's and early 1980's, the Federal Government adopted specific programs to aid research and development of EOR technology. See id. at 135-136. In holding that the taxpayers in Krause were not liable for the negligence addition to tax, this Court noted that one of the Government's expert witnesses acknowledged that "investors may have been significantly and reasonably influenced by the energy price hysteria that existed in the late 1970s and early 1980s to invest in EOR technology." Id. at 177. While EOR was, according to our opinion in Krause, at the forefront of national policy and the media during the late 1970's and early 1980's, petitioners have failed to demonstrate that the so-called energy crisis provided a reasonable basis for them to invest in Masters.

In addition, the taxpayers in Krause were either experienced in or investigated the oil industry and EOR specifically. One of

the taxpayers in <u>Krause</u> undertook a significant investigation of the proposed investment, including researching EOR. The other taxpayer was a geological and mining engineer who hired an independent expert to review the offering materials. See <u>id.</u> at 166. In contrast, petitioners did not have any experience or education in plastics recycling. Moreover, neither Keith nor Warren undertook an independent investigation of Masters. Petitioners failed to hire an independent expert in plastics to evaluate the transaction.

Keith and Warren were both sophisticated and well educated businessmen. There were many factors that should have alerted petitioners to conduct independent investigations of Masters. The offering memorandum warned each prospective purchaser that he should consult with his own professional adviser as to the legal, tax, and business aspects of investing in Masters. Moreover, the offering memorandum also warned potential investors about numerous business and tax risks. Nevertheless, petitioners disregarded these warnings and failed to undertake an appropriate independent investigation.

3. <u>Conclusion as to Negligence</u>

Under the circumstances of these cases, petitioners failed to exercise due care in claiming large deductions and tax credits with respect to Masters on their Federal income tax returns. It was not reasonable for petitioners to rely as they did on the

offering memorandum, promoters, or insiders to the transaction. Petitioners' accountants were asked to make only a limited technical examination of the documents presented to them as a tax shelter, and that is all they did. Petitioners, Grande, and Maki did not undertake a good faith investigation of the fair market value of the recyclers or the underlying economic viability or financial structure of Masters.

Upon consideration of this record, we hold that petitioners are liable for the negligence additions to tax under section 6653(a)(1) and (2).

B.  Section 6659 Valuation Overstatement

In the notices of deficiency in these cases, respondent determined that petitioners were liable for section 6659 additions to tax on the portions of their respective underpayments attributable to valuation overstatements. Under section 6659, a graduated addition to tax is imposed when an individual has an underpayment of tax that equals or exceeds $1,000 and is attributable to a valuation overstatement. See sec. 6659(a), (d). A valuation overstatement exists if the fair market value (or adjusted basis) of property claimed on a return equals or exceeds 150 percent of the amount determined to be the correct amount. See sec. 6659(c). If the claimed valuation exceeds 250 percent of the correct value, the addition is equal to 30 percent of the underpayment. See sec. 6659(b).

Petitioners claimed tax benefits, including investment tax credits and business energy credits, based on a purported value of $1,750,000 for each recycler.  Petitioners have conceded that the fair market value of a recycler in 1982 was not in excess of $50,000.  Accordingly, if disallowance of petitioners' claimed benefits is attributable to such valuation overstatements, petitioners are liable for section 6659 additions to tax at the rate of 30 percent of the underpayments of tax attributable to tax benefits claimed with respect to Masters.

Petitioners contend that section 6659 does not apply in their cases because (1) disallowance of the claimed tax benefits was attributable to other than a valuation overstatement, and (2) Masters' concession in the underlying partnership case precludes imposition of the section 6659 additions to tax.

1.  The Grounds for Petitioners' Underpayments

Petitioners argue that where, as here, the Commissioner completely disallows a tax benefit, the tax underpayment cannot be attributable to a valuation overstatement.  Petitioners cite the following cases to support their argument:  Heasley v. Commissioner, 902 F.2d 380 (5th Cir. 1990), revg. T.C. Memo. 1988-408; Gainer v. Commissioner, 893 F.2d 225 (9th Cir 1990), affg. T.C. Memo. 1988-416; Todd v. Commissioner, 862 F.2d 540 (5th Cir. 1988), affg. 89 T.C. 912 (1987); McCrary v. Commissioner, 92 T.C. 827 (1980).

Section 6659 does not apply to underpayments of tax that are not "attributable to" valuation overstatements. Todd v. Commissioner, supra; McCrary v. Commissioner, supra. "To the extent taxpayers claim tax benefits that are disallowed on grounds separate and independent from alleged valuation overstatements, the resulting underpayments of tax are not regarded as attributable to valuation overstatements." Krause v. Commissioner, 99 T.C. 132, 178 (1992) (citing Todd v. Commissioner, supra). However, when valuation is an integral factor in disallowing deductions and credits, section 6659 is applicable. See Merino v. Commissioner, 196 F.3d 147 (3d Cir. 1999), affg. T.C. Memo. 1997-385; Zfass v. Commissioner, 118 F.3d 184 (4th Cir. 1997), affg. T.C. Memo. 1996-167; Illes v. Commissioner, 982 F.2d 163 (6th Cir. 1992), affg. T.C. Memo. 1991-449; Gilman v. Commissioner, 933 F.2d 143, 151 (2d Cir. 1991), affg. T.C. Memo. 1989-684; Massengill v. Commissioner, 876 F.2d 616 (8th Cir. 1989), affg. T.C. Memo. 1988-427.

Petitioners' reliance on Gainer v. Commissioner, supra, and Todd v. Commissioner, supra, ignores that this Court as well as the Court of Appeals for the Eighth Circuit, the court to which appeals in these cases would lie, has held that "when an underpayment stems from disallowed depreciation deductions or investment credits due to lack of economic substance, the deficiency is attributable to overstatement of value, and subject

to the penalty under section 6659." <u>Massengill v. Commissioner</u>, <u>supra</u> at 619-620; see also <u>Zirker v. Commissioner</u>, 87 T.C. 970 (1986).

We also find that the facts in these cases are distinguishable from the facts in <u>Gainer v. Commissioner</u>, <u>supra</u>, <u>Todd v. Commissioner</u>, <u>supra</u>, and <u>McCrary v. Commissioner</u>, <u>supra</u>. In <u>Gainer</u> and <u>Todd</u>, it was found that a valuation overstatement did not contribute to an underpayment of taxes. In those cases, the underpayments were due exclusively to the fact that the property in each case had not been placed in service. In <u>McCrary</u>, the underpayments were deemed to result from a concession that the agreement at issue was a license and not a lease. Although property was overvalued in each of those cases, the overvaluation was not the grounds on which the taxpayers' liabilities were sustained. In contrast, a "different situation exists where a valuation overstatement * * * is an integral part of or is inseparable from the ground found for disallowance of an item." <u>McCrary v. Commissioner</u>, <u>supra</u> at 859. In the present cases, we find that the overvaluation of the recyclers was integral to and inseparable from petitioners' claimed tax benefits and the determination that Masters lacked economic substance.[4]

---

[4] To the extent that <u>Heasley v. Commissioner</u>, 902 F.2d 380 (5th Cir. 1990), revg. T.C. Memo. 1988-408, merely represents an

(continued...)

In the present cases, petitioners have conceded that the recyclers' fair market value in 1982 did not exceed $50,000. Petitioners have also conceded that the Masters transaction and the recyclers in these cases are substantially identical to the transactions and recyclers considered in Provizer v. Commissioner, T.C. Memo. 1992-177. In Provizer, our finding that the recyclers were overvalued was the dominant factor that led us to hold that the transaction lacked economic substance. See Sann v. Commissioner, T.C. Memo. 1997-259. Based on this record, we find that the recyclers overvaluation was a dominant factor in regard to: (1) The disallowed tax credits, and other benefits in these cases; (2) the underpayments of tax; and (3) the determination that the Masters transaction lacked economic substance.

Lastly, we note that petitioners' argument is similar to the arguments that were raised in other plastics recycling cases. See Merino v. Commissioner, 196 F.3d 147 (3d Cir. 1999); Singer v. Commissioner, T.C. Memo. 1997-325; Kaliban v. Commissioner,

---

4(...continued)
application of Todd v. Commissioner, 862 F.2d 540 (5th Cir. 1988), affg. 89 T.C. 912 (1987), we consider Heasley distinguishable. To the extent that Heasley is based on a concept that where an underpayment derives from the disallowance of a transaction for lack of economic substance, the underpayment cannot be attributable to an overvaluation, this Court, as well as the Court of Appeals for the Eighth Circuit have disagreed. See Massengill v. Commissioner, 876 F.2d 616 (8th Cir. 1989), affg. T.C. Memo. 1988-427.

T.C. Memo. 1997-271; Sann v. Commissioner, supra.  In all of those cases, we rejected this argument.

2.  Concession of the Deficiency

Petitioners also argue that Masters' concession in the underlying partnership case precludes imposition of the section 6659 additions to tax.  Petitioners contend that Masters' concession renders any inquiry into the grounds for such deficiencies moot.  Petitioners argue that absent such inquiry it cannot be known if their underpayments were attributable to a valuation overstatement or other discrepancy and that without a finding that a valuation overstatement contributed to an underpayment, section 6659 cannot apply.  In support of this line of reasoning, petitioners rely heavily upon Heasley v. Commissioner, 902 F.2d 380 (5th Cir. 1990), and McCrary v. Commissioner, 92 T.C. 827 (1980).

Masters' concession does not obviate our finding that Masters lacked economic substance due to overvaluation of the recyclers.  The value of the recyclers was established in Provizer v. Commissioner, supra, and stipulated by the parties. As a consequence of the inflated value assigned to the recyclers by Masters, petitioners claimed deductions and credits that resulted in underpayments of tax.  Regardless of Masters' concession in the underlying partnership case, in these cases the

underpayments of tax were attributable to the valuation overstatements.

Moreover, concession of the investment tax credit in and of itself does not relieve taxpayers of liability for the section 6659 addition to tax. See Singer v. Commissioner, supra; Kaliban v. Commissioner, supra; Sann v. Commissioner, supra; Dybsand v. Commissioner, T.C. Memo. 1994-56; Chiechi v. Commissioner, T.C. Memo. 1993-630. Instead, the ground upon which the investment tax credit is disallowed or conceded is significant. See Dybsand v. Commissioner, supra. Even in situations in which there are arguably two grounds to support a deficiency and one supports a section 6659 addition to tax and the other does not, the taxpayer may still be liable for the addition to tax. See Gainer v. Commissioner, 893 F.2d 225 (9th Cir. 1990); Irom v. Commissioner, 866 F.2d 545, 547 (2d Cir. 1989), vacating in part T.C. Memo. 1988-211; Harness v. Commissioner, T.C. Memo. 1991-321.

In these cases, petitioners each stipulated substantially the same facts concerning the Masters transaction as we found in Provizer v. Commissioner, supra. In Provizer, we held that the taxpayers were liable for the section 6659 addition to tax because the underpayment of taxes was directly related to the overvaluation of the recyclers. The overvaluation of the recyclers, exceeding 2325 percent, was an integral part of our findings in Provizer that the transaction was a sham and lacked

economic substance.  Similarly, the records in these cases plainly show that the overvaluation of the recyclers is integral to and is the core of our holding that Masters was a sham and lacked economic substance.

Petitioners' reliance on McCrary v. Commissioner, supra, is misplaced.  In that case, the taxpayers conceded entitlement to their claimed tax benefits, and the section 6659 addition to tax was held inapplicable.  However, the taxpayers' concession of the claimed tax benefits, in and of itself, did not preclude imposition of the section 6659 addition to tax.  In McCrary v. Commissioner, supra, the section 6659 addition to tax was disallowed because the agreement at issue was conceded to be a license and not a lease.  In contrast, the records in petitioners' cases plainly show that petitioners' underpayments were attributable to overvaluation of the recyclers. Accordingly, petitioners' reliance on McCrary v. Commissioner, supra, is inappropriate.[5]

We held in Provizer v. Commissioner, supra, that each recycler had a fair market value not in excess of $50,000.  Our

---

[5]     Petitioners' citation of Heasley v. Commissioner, supra, in support of the concession argument is also inappropriate.  The Heasley case was not decided by the Court of Appeals for the Fifth Circuit on the basis of a concession.  Moreover, see supra note 4 to the effect that the Court of Appeals for the Eighth Circuit and this Court have not followed the Court of Appeals for the Fifth Circuit's rationale with respect to the application of sec. 6659.

finding in <u>Provizer</u> that the recyclers had been overvalued was integral to and inseparable from our holding of a lack of economic substance. Petitioners stipulated that the transaction in Masters was substantially similar to the transaction described in <u>Provizer</u>, and that the fair market value of the recyclers in 1982 was not in excess of $50,000. Given those concessions, and the fact that the records here plainly show that the overvaluation of the recyclers was integral to and inseparable from the determination that Masters lacked economic substance, we conclude that the deficiencies were attributable to the overvaluation of the recyclers.

For the foregoing reasons, we hold that petitioners are liable for the section 6659 additions to tax for valuation overstatement.

To reflect the foregoing,

<u>Decisions will be entered</u>

<u>for respondent</u>.